**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE LOUIS D. BRANDEIS CENTER, INC.<br>　　1717 Pennsylvania Avenue, NW<br>　　Suite 1025<br>　　Washington, DC 20006,<br><br>　　and<br><br>JEWISH AMERICANS FOR FAIRNESS IN<br>EDCUATION<br>　　1717 Pennsylvania Avenue NW<br>　　Suite 1025<br>　　Washington, DC 20006,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>U.S. DEPARTMENT OF EDUCATION,<br>　　400 Maryland Avenue, S.W.,<br>　　4th Floor<br>　　Washington, D.C. 20202,<br><br>MIGUEL CARDONA in his official capacity<br>as Secretary, U.S. Department of Education,<br>　　400 Maryland Avenue, S.W.,<br>　　Washington, D.C. 20202,<br><br>　　and<br><br>CATHERINE LHAMON in her official<br>capacity as Assistant Secretary, U.S.<br>Department of Education,<br>　　400 Maryland Avenue, S.W.,<br>　　Washington, D.C. 20202,<br><br>　　　　Defendants. | No.<br><br>**COMPLAINT** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

PARTIES ...........................................................................................................5

JURISDICTION AND VENUE ........................................................................8

FACTUAL ALLEGATIONS .............................................................................8

I.      Anti-Semitism at Penn ...........................................................................8

II.     The Brandeis Center Complaint ...........................................................15

III.    The Private Lawsuit Against Penn ........................................................16

IV.     OCR's Dismissal of the Brandeis Center's Complaint..........................17

RELEVANT LEGAL FRAMEWORK .............................................................18

CAUSES OF ACTION.....................................................................................20

PRAYER FOR RELIEF ....................................................................................27

Plaintiffs THE LOUIS D. BRANDEIS CENTER, INC. (the "Brandeis Center") and JEWISH AMERICANS FOR FAIRNESS IN EDCUATION ("JAFE"), by and through their undersigned counsel, hereby file this Complaint against Defendants U.S. DEPARTMENT OF EDUCATION, MIGUEL CARDONA, in his official capacity as Secretary, U.S. Department of Education, and CATHERINE LHAMON, in her official capacity as Assistant Secretary, U.S. Department of Education, alleging as follows:

## INTRODUCTION

1.    A tsunami of anti-Semitism has swept the United States since the Hamas massacre of upwards of 1,200 people in Israel on October 7, 2023. That bigotry has manifested in a particularly acute and virulent way on college campuses, where masked protestors—whether affiliated with the colleges or just interlopers—openly supporting Hamas and the killing of Jews have built encampments; taken over buildings; damaged or destroyed property; physically and verbally harassed and abused students, professors and administrators; and disrupted or even forced the cancellation of classes and graduations.

2.    In the face of these developments, some university leaders have responded appropriately and have stopped the protesters from disrupting their campuses and harassing other students.

3.    The University of Pennsylvania ("Penn"), however, has taken a different, and utterly misguided, tack. More specifically, Penn's administration has stood by and enabled blatantly anti-Semitic activities to infect the campus even before the October 7 massacre, and then permitted such activities to intensify following the horrific slaughter of that day—the single worst massacre of Jews since the Holocaust, not to mention the killing

of many other non-Jews and non-Israelis as well as the rape, maiming, and kidnapping of hundreds of other innocent people.

4.     Pursuant to its authority under Title VI of the Civil Rights Act of 1964 ("Title VI"), the Department of Education's Office for Civil Rights ("OCR") initially agreed to investigate Penn's failure to act against the rampant anti-Semitism sweeping its campus.

5.     But, fewer than two months later, OCR precipitously, and inexplicably, reversed course and prematurely shut down its investigation.  On information and belief, this action was part of a pattern of unlawful dismissals of cases brought alleging campus anti-Semitism since October 7, 2023.

6.     OCR's action was arbitrary and capricious, and on information and belief contributed to the escalation of anti-Semitic activities on Penn's campus over the last several months.  In fact, OCR's stated "explanation" for its abrupt about-face was directly contrary to governing statutes, regulations, and OCR's own Case Processing Manual (the "Manual").

7.     In a brief letter, OCR claimed it was shutting down its investigation, not based on a lack of merit as to the allegations against Penn's administration, but supposedly because two Penn students had filed a lawsuit against the university echoing many of the same allegations that the administration was allowing pervasive anti-Semitism to mushroom, creating a toxic and dangerous environment for Jewish students.

8.     Under Section 110 of the OCR's Manual, the agency is permitted to close an investigation of a college or university when private plaintiffs file a *class action* complaint asserting the same allegations.  Here, however, the private lawsuit filed against

Penn was obviously *not* a class action, but OCR, for reasons unknown but in any event unfounded, shut down its own investigation anyway.

9.      Plaintiffs here—a national civil rights organization and its membership organization, whose members have been victimized by the anti-Semitic activities on Penn's campus—are bringing this action to remedy this arbitrary and capricious dereliction of duty by OCR.

10.      More specifically, OCR is statutorily charged with protecting students from precisely the type and manner of pervasive discriminatory harassment and intimidation that Jewish students have been subject to at Penn and are now suffering on campuses across the country.

11.      OCR's self-proclaimed mission is "to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights."[1]     Critical to fulfilling that mission "is resolving complaints of discrimination."[2]     Relevant statutes, regulations, and agency policy require OCR to investigate credible allegations of violations of certain federal civil rights statutes, and prescribe only narrow circumstances under which an investigation can be dismissed.

12.      Plaintiff the Brandeis Center brought the deteriorating situation at Penn to OCR's attention in November 2023 by filing a 23-page complaint detailing the University's failure to protect its Jewish students.

13.      OCR initially agreed to investigate the allegations—which, notably, it does not do with every complaint it receives.   The filing of the private lawsuit echoing the

---

[1]     "About OCR," U.S. Department of Education website, available at https://www2.ed.gov/about/offices/list/ocr/aboutocr.html.

[2]     *Id.*

allegations in the Brandeis Center complaint should only have bolstered the Brandeis Center complaint and spurred OCR to intensify its investigation. Its decision to instead cancel its investigation, and thereby short-circuit its own obligations, is contrary to law and must be corrected.

14.     Moreover, OCR provided the Brandeis Center with no notice that it was even considering dismissing the complaint. And because, 18 months earlier OCR had abolished—without notice and comment—its internal appeals process, Plaintiffs had no opportunity to be heard either before or after the Department dismissed the complaint.

15.     The Department of Education's denial of the public's right to be heard before revoking OCR's appeals process is also contrary to law—specifically, the Administrative Procedure Act ("APA"). And, denying Plaintiffs notice and an opportunity to be heard before closing the Penn investigation was a separate violation of the fundamental precepts of due process.

16.     Jewish students at Penn—like all students—are entitled to protection by the civil rights laws of the United States. OCR has abdicated its responsibility to investigate and seek remedies for violations of the Civil Rights Act. Its dismissal of the Penn complaint and abandonment of its investigation have left Jewish students without adequate recourse for Penn's violations of Title VI.

17.     This lawsuit seeks reinstatement of the improperly dismissed complaint and resumption of OCR's investigation into the University of Pennsylvania for its failure to protect Jewish students from the campaign of hate and intimidation that they, and Jewish students across the country, are now facing. This lawsuit further seeks reinstatement of all other OCR investigations unlawfully dismissed under Section 110 since October 7, 2023,

based on false claims regarding the existence of class action lawsuits, such as the dismissal of a complaint brought against the University of California at Berkeley.

## PARTIES

18.    Plaintiff Brandeis Center is a nonprofit, non-partisan corporation established in 2011 to advance the civil and human rights of the Jewish people and to promote justice for all.  The Brandeis Center engages in research, education, and legal advocacy to combat anti-Semitism on college and university campuses and in K-12, in the workplace, and elsewhere.  It empowers students by training them to understand their legal rights and educates administrators and employers on best practices to combat racism and anti-Semitism.

19.    The Brandeis Center has expended considerable resources in responding to anti-Semitic activities that have engulfed Penn's campus, including counseling aggrieved students and professors, raising public awareness of the administration's misconduct, requesting public documents to better understand Penn's violations, and incurring out-of-pocket expenses.  Brandeis Center attorneys and staff have been diverted from other work while dealing with these matters.  Members of the Brandeis Center have personally been aggrieved by, or have by association been impacted by, anti-Semitism and discrimination in higher education and K-12.

20.    Plaintiff JAFE is a national membership organization that is housed within and operated by the Brandeis Center.  JAFE's mission, like that of the Brandeis Center, is to advance the civil and human rights of the Jewish people and promote justice for all, and, in particular, to eliminate anti-Semitism and discrimination in education and ensure fairness in education for Jewish, Israeli, and other Americans through lawful means, including litigation.  JAFE's members consist of Jewish American college students,

graduate and professional students, parents, alumni, faculty, and other individuals who have personally been aggrieved by, or have by association been impacted by, anti-Semitism and discrimination in higher education and K-12.  JAFE has members throughout the country, including Jewish American students and professors affiliated with higher education and K-12 institutions across the United States. JAFE's membership includes Penn undergraduate, graduate, and law students, as well as Penn faculty, including but not limited to, JAFE Member #1 and JAFE Member #2.[3]

21.    JAFE Member #1 is a Jewish dental student at The University of Pennsylvania School of Dental Medicine.  He attended Penn as an undergraduate.  He was unable to access parts of the campus during the encampment and feels that Penn's administration has not adequately addressed rising anti-Semitism on its campus even before Oct 7.  He also believes that there needs to be accountability and consequences for those students who violate Penn's rules and contribute to the hostile environment for Jewish and Israeli students.

22.    JAFE Member #2 is a first-year law student at Penn Law.  She feels isolated on Penn's campus as a Jewish student.  Her experience as a law student at Penn, including her ability to engage in all educational activities, has been impaired by the constant protests and takeovers of campus areas.

23.    In addition, the Brandeis Center's and JAFE's members include current Jewish students at other universities whose civil rights have been limited by OCR's pattern

---

[3]    Because of its affiliation with the Brandeis Center, members of JAFE also become members of the Brandeis Center.  While all members of JAFE are also members of the Brandeis Center, for simplicity they are referred to here simply as JAFE members.

of wrongfully dismissing campus anti-Semitism complaints. OCR's wrongful dismissal of such claims has undermined efforts to achieve equal educational opportunities for Jewish college students.

24.     The Brandeis Center's and JAFE's members also include the parents of numerous Jewish high school students. These students are likely to be future college students. As such, their civil rights have been denied by OCR's refusal to conduct statutorily-required actions to ensure equal educational opportunities for Jewish college students.

25.     Together, Plaintiffs are organizations, including their members, who have been or are being injured by the Defendants' failure to comply with appliable statutes, regulations and policy, including the requirements of Chapter 5 of the federal APA.

26.     Defendants are the U.S. Department of Education (the "Department" or "DOE"), U.S. Secretary of Education Miguel Cardona, and Catherine Lhamon, Assistant Secretary, Office for Civil Rights, U.S. Department of Education. Mr. Cardona and Ms. Lhamon are sued in their official capacities.

27.     As the U.S. Secretary of Education, Mr. Cardona is responsible for the administration of the DOE in accordance with law, including adoption of rules and regulations pursuant to the rule-making procedures set forth in the APA, 5 U.S.C. §§ 551, *et seq.*

28.     As the Assistant Secretary, Civil Rights, Ms. Lhamon is responsible for the administration of the OCR in accordance with law, including mandating procedures for the handling and processing of complaints of illegal discrimination made to OCR.

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

30.    This Court has authority to issue declaratory relief pursuant to 28 U.S.C. § 2201.

31.    Venue is properly in this Court under 28 U.S.C. § 1391(e)(1), because the United States, its agencies, and its officials acting in their official capacity may be sued in the federal judicial jurisdiction in which the plaintiffs reside, so long as no real property is involved in the suit.  For purposes of venue, an organization or association is deemed to reside in the judicial district in which it maintains its principal place of business.  28 U.S.C. § 1391(c)(2).  Plaintiff the Brandeis Center's principal place of business is in Washington, DC.  Venue in this Court is also appropriate because a substantial part of the events or omissions giving rise to the claim arose in this District and because Defendant Department of Education resides in this District.

## FACTUAL ALLEGATIONS

### I.    Anti-Semitism at Penn

32.    As detailed in the complaint that the Brandeis Center filed with the OCR in November 2023, Penn has been a hostile campus for Jews since before October 7, 2023.

33.    A prestigious Ivy League school, Penn has not only allowed anti-Semitism to fester among its own students and faculty, but has become a magnet for anti-Semites attending nearby colleges or living in the surrounding area that the University deems the "Penn community."

34.    The University's tolerance of this hostile environment is a violation of Title VI of the Civil Rights Act, which prohibits the exclusion from full participation in any

program that receives federal funding on the basis of a person's race, ethnicity, or national origin.

35.    For example, on September 22–24, 2023, Penn sponsored, hosted, and funded a "Palestine Writes Festival."[4]  Billed as a "literature festival," the event featured multiple speakers with well-documented histories of anti-Semitism but no significant literary experience.  By allowing University departments to publish brochures and fliers advertising the event in Penn's name, the University effectively took ownership of the Festival.

36.    In the days leading up to the Festival, a swastika was graffitied on a classroom wall.  And on September 21, a man broke into and vandalized the Penn Hillel, screaming "F*ck the Jews.  They killed JC."[5]

37.    Coinciding with the Jewish High Holy Days, the Festival included at least 25 speakers identified by the Anti-Defamation League as prominent anti-Jewish actors.

38.    One such speaker was Susan Abulhawa, who has referred to Israel as "one big, militarized tumor" and "the contemporary face of Nazism and white supremacy."[6]  Susan Abulhawa was co-chair of the Palestine Write Festival and the festival's executive director.  Previously, major supporters of a "Writers Week" in Australia had withdrawn their sponsorship due precisely to Abulhawa's presence at the event, in protest of her "racist

---

[4]    Letter from Brandeis Center to Office for Civil Rights (Nov. 9, 2023) (hereafter "OCR Complaint"), at 6.

[5]    Tony Fels, *Jew Hatred Is Not The Problem At Penn (Or Other Universities). Radicalism Is.*, TABLET (Mar. 31, 2024), available at https://www.tabletmag.com/sections/news/articles/jew-hatred-not-problem-universities-political-radicalism.

[6]    OCR Complaint at 7.

or antisemitic commentary."[7]  Another speaker was Randa Abdel-Fattah, who has written that "Israel is a demonic, sick project, and I can't wait for the day we commemorate its end."[8]  The primary program of speakers such as these is to falsely deny the Jewish people's ancestral connection to Israel and accuse Jews for whom that connection is a core part of their Jewish identity—*i.e.*, virtually all Jews—of crimes against humanity.

39.    Although scores of students, alumnae, faculty, donors and trustees urged Penn's then-President, Liz Magill, to remove Penn's name from the Festival and to condemn the anti-Semitic speakers, Magill offered only tepid statements of support for Penn's Jewish community, defending the Festival in the name of free speech.  Later, Magill conceded that her statements were inadequate.

40.    The Festival itself featured a number of overtly anti-Semitic speeches.  One speaker, Bassam Abun-Nadi, warned attendees of "Jewish Supremacism."[9]  Another, Marc Lamont Hill, expounded on a so-called "Deadly Exchange Program," falsely claiming that Israelis and Jews train American police officers to persecute and harm Black American citizens.[10]   Yet another speaker, Noura Erakat, encouraged Palestinian leaders to use violence as "leverage."[11]  And another, Ghada Karmi, called for a "One State" solution, conceding that such a plan would entail violence against Israelis and Jews in an effort to dismantle the Jewish state.[12]

---

[7]    *Id.* at  8 & n.16.

[8]    *Id.* at  8.

[9]    *Id.* at 13.

[10]   *Id.*

[11]   *Id.*

[12]   *Id.* at 14.

41.    On September 27, Penn Chabad's sukkah was vandalized with graffiti.[13]

42.    The horrific October 7, 2023 Hamas attack on Israel took place fewer than two weeks after the Festival ended.

43.    Sickeningly, anti-Semites at Penn praised the Hamas attack, which featured the brutal murdering of women and children—including infants, gang rapes, tying family members together and burning them alive, and the kidnapping of more than 200 hundred Israelis, both dead and alive.

44.    Penn Professor Huda Fakhreddine tweeted that "[w]hile we were asleep, Palestine invented a new way of life."[14]  And on October 8, the registered student group "Penn Against the Occupation" (PAO) promoted a rally to "cheer for Hamas."[15]

45.    On October 16, more than one hundred "Penn community members" gathered in front of Van Pelt library for a seven-hour rally.[16]  At that rally, attendees expressed solidarity with Hamas, chanted for the eradication Israel, and called openly for an "intifada revolution."  One speaker told Jewish students to "go back to Moscow, Brooklyn…f*cking Berlin where you came from."  Another participant shoved a Jewish student to the ground.

---

[13]    Tony Fels, *Jew Hatred Is Not The Problem At Penn (Or Other Universities). Radicalism Is.*, TABLET (Mar. 31, 2024), available at https://www.tabletmag.com/sections/news/articles/jew-hatred-not-problem-universities-political-radicalism.

[14]    OCR Complaint at 19.

[15]    *Id*. at 15.

[16]    *Id*. at 16.

46.     On October 20, the property next door to a Jewish fraternity—Alpha Epsilon Pi—was vandalized with graffiti that read "The Jews R Nazis."[17]

47.     Around that same time, a Penn library staffer tore down posters of Israeli children held hostage by Hamas.  When questioned by a Penn student, the staffer yelled "F*ck you!" at the student.[18]

48.     On October 28, a member of PAO ripped down and stole an Israeli flag from an off-campus Orthodox Jewish house that regularly hosts Shabbat meals.[19]

49.     At a rally held in early November, a Penn student praised the "joyful and powerful images which came from the glorious October 7" massacre.[20]

50.     On November 6, the Penn Hillel rabbi advised the community that "a small number of Penn staff members received vile, disturbing anti-Semitic emails threatening violence against members of our Jewish community, specifically naming Penn Hillel and Lauder College House.  These messages also included hateful language, targeting the personal identities of the recipients."[21]

51.     On November 8, PAO projected "From the river to the sea, Palestine will be free" and "Zionism is racism" onto campus buildings.[22]

---

[17]   *Id*. at 17.

[18]   *Id*.

[19]   *Id*. at 18.

[20]   Jack Morphet and Megan Palin, *UPenn's Jewish Students Still Subjected To 'Anger and Aggression,' Protestors Chanting 'We Are Hamas,'* N.Y. Post (Dec. 9, 2023), available at https://nypost.com/2023/12/09/news/jewish-upenn-students-subjected-to-chants-of-we-are-hamas/.

[21]   OCR Complaint at 21.

[22]   Sophia Liu, *Penn Denounces Projections of Pro-Palestinian Messages Onto Campus Buildings as 'Antisemitic,'* The Daily Pennsylvanian (Nov. 9, 2023), available at

52.    On December 3, a rally attended by over 500 people left businesses on Walnut Street near campus graffitied with messages such as "F*ck the IDF" and "Intifada."[23]  Attendees also chanted that "[f]rom water to water, Palestine will be Arab."[24] Rallies occurring in early December also featured Penn students chanting that "we are Hamas."[25]

53.    On December 5, Magill appeared at a hearing of the United States House Committee on Education and the Workforce on the subject of "Holding Campus Leaders Accountable and Confronting Antisemitism."  During that hearing, Magill testified that it was "context dependent" whether it would be a violation of Penn's code of conduct to "call[] for the genocide of the Jewish people."[26]  On December 11, Magill resigned as president of Penn.

54.    On January 2, 2024, PAO's Instagram account encouraged the following: "Resist with whatever tool you can get your hand on . . . for each 1000 men, there must be

---

https://www.thedp.com/article/2023/11/penn-pro-palestinian-projections-huntsman-hall-penn-commons.

[23]    Emily Scolnick, *Pro-Palestinian Supporters Rally Against War in Gaza as Penn Investigates Graffiti Along March Route*, THE DAILY PENNSYLVANIAN (Dec. 4, 2023), available at https://www.thedp.com/article/2023/12/penn-protest-rally-palestine-gaza-uc-townhomes.

[24]    *Id*.

[25]    Jack Morphet and Megan Palin, *UPenn's Jewish Students Still Subjected To 'Anger and Aggression,' Protestors Chanting 'We Are Hamas,'* N.Y. Post (Dec. 9, 2023), available at https://nypost.com/2023/12/09/news/jewish-upenn-students-subjected-to-chants-of-we-are-hamas/.

[26]    Jonah Miller and Emily Scolnick, *Penn Students, Donors Call For Magill To Resign As Pa. Gov. Shapiro Slams Testimony Before Congress*, THE DAILY PENNSYLVANIAN (Dec. 7, 2023), available at https://www.thedp.com/article/2023/12/penn-donors-shapiro-criticize-magill-testimony.

1000 more willing to resist a million…for this [is] our land and all the laws in this world say, this is our land."[27]

55.    Also in January 2024, Professor Dwayne Booth, a lecturer at Penn's Annenberg School for Communication, published cartoons depicting Jewish men drinking blood out of glasses labeled "Gaza" and Prime Minister of Israel Benjamin Netanyahu shoveling skulls into a steam engine.[28]

56.    On February 26, a joint protest by the Police Free Penn and Save the UC Townhomes groups called for "Intifada revolution" and chanted that "[w]e won't stop at ceasefire."[29]

57.    On April 25, more than two-hundred student erected tents and an encampment on Penn's campus.[30]  Those protestors graffitied anti-Semitic messages on a College Hall statue and chanted "[f]rom the river to the sea, Palestine will be free."[31]

---

[27]    Written Testimony of Noah Rubin, *Roundtable With Jewish Students Impacted By Antisemitism*, United States House of Representatives Committee on Education and the Workforce (Feb. 29, 2024), at 9, available at https://edworkforce.house.gov/uploadedfiles/written_testimony_of_noah_rubin_2-29-2024-1.pdf.

[28]    Jessica Wu, *Jameson Criticizes 'Reprehensible' Political Cartoons Amid Antisemitism Claims Against Penn Lecturer*, THE DAILY PENNSYLVANIAN (Feb. 4, 2024), available at https://www.thedp.com/article/2024/02/penn-antisemitism-cartoons-jameson-statement.

[29]    Diamy Wang and Katie Bartlett, *Penn Junior Criticizes University Response to Antisemitism During Congressional Roundtable*, THE DAILY PENNSYLVANIAN (Mar. 1, 2024), available at https://www.thedp.com/article/2024/03/penn-antisemitism-house-roundtable.

[30]    *Pro-Palestinian Protestors March Through Center City, Set Up Camp At Penn*, NBC PHILADELPHIA (Apr. 25, 2024), available at https://www.nbcphiladelphia.com/news/local/pro-palestinian-protesters-march-through-center-city-gather-at-penn/3842198/.

[31]    David Propper, *Jewish UPenn Students Say School 'Powerless' Against Anti-Israel Protesters Who Flout Order To Clear Encampment*, N.Y. POST (Apr. 29, 2024),

58.     On May 10, police dismantled the encampment that had been standing for more than two consecutive weeks.[32]  Thirty-three individuals—nine students and twenty-four people with no Penn affiliation—were arrested, and police discovered inside the encampment "several homemade weapons devised with chains, bolts, and other metal parts."[33]

59.     On May 17, 19 individuals—including seven Penn students—attempted to occupy Penn's Fisher-Bennett Hall, using "zip-ties, barbed wire, and . . . metal chairs and desks."[34]  According to Penn, officers clearing the hall discovered "lock-picking tools and homemade metal shields fashioned from oil drums."[35]  Members of Penn Gaza Solidarity announced their participation in the takeover.[36]

## II.    The Brandeis Center Complaint

60.     The Brandeis Center brought the deteriorating situation at Penn—and the Penn administration's enabling of it—to OCR's attention before it had fully metastasized. It filed a 27-page complaint with OCR on November 9, 2023, detailing the anti-Semitic

---

available at https://nypost.com/2024/04/29/us-news/jewish-upenn-students-say-school-is-powerless-against-anti-israel-protesters/.

[32]  Phoenix Berman, Will Kenworthy, Dan Snyder, Adam Fox, Josh Sanders, Tom Dougherty, Joe Holden, Fletcher Rumbaugh, Mike Spatocco, and Kim Hudson, *Police Dismantle Pro-Palestinian Protest Encampment on Penn's Campus; 33 Cited*, CBS NEWS (May 10, 2024), available at https://www.cbsnews.com/philadelphia/news/police-move-in-on-pro-palestinian-encampment-at-the-university-of-pennsylvania/.

[33]  *Id.*

[34]  Briana Smith, *19 Protesters Arrested After Trying To Occupy Penn's Fisher-Bennett Hall*, 6ABC (May 18, 2024), available at https://6abc.com/post/university-of-pennsylvania-protest-tonight-philadelphia-police-city/14834786/.

[35]  *Id.*

[36]  *Id.*

incidents as of that date and the administration's failure to stop them.  A redacted copy of that complaint is annexed hereto as **Exhibit A**.

61.    OCR's regulations *require* an investigation to proceed whenever a complaint indicates a potential violation of OCR's anti-discrimination standards.  *See* 34 C.F.R. § 100.7(c).

62.    On November 15, 2023 the Department of Education informed the Brandeis Center that it was opening an investigation into "[w]hether the [University of Pennsylvania] failed to respond to alleged harassment of students and staff on the basis of national origin in a manner consistent with the requirements of Title VI."  The DOE's November 15, 2023 letter is annexed hereto at **Exhibit B**.

63.    The Department's Letter stated that "OCR will ensure that its investigation is legally sufficient and fully responds to the allegation in accordance with the provisions of the Case Processing Manual."  The letter included a hyperlink to the Manual,[37] a copy of which is annexed hereto as **Exhibit C**.

## III.    **The Private Lawsuit Against Penn**

64.    On December 5, 2023, two undergraduate Penn students filed a lawsuit in the U.S. District Court for the Eastern District of Pennsylvania against the University of Pennsylvania.  The lawsuit is captioned *Yakoby* v. *University of Penn.*, No. 2:23-cv-04789-MSG (E.D. Pa.).

---

[37]    "U.S. Department of Education Office for Civil Rights Case Processing Manual (CPM)," available at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

65.    Plaintiffs in the *Yakoby* action asserted claims for violations of Title VI of the Civil Rights Act, Breach of Contract, and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Laws.

66.    The *Yakoby* action is not a putative class action.  Any settlement in the *Yakoby* action would not be subject to the fairness requirements in Federal Rule of Civil Procedure 23(e).  Plaintiffs here would have no right to object that any potential settlement in the *Yakoby* action provides no or insufficient systemic relief for Jewish students at Penn.

**IV.    OCR's Dismissal of the Brandeis Center's Complaint**

67.    On January 2, 2024, the Department of Education notified Brandeis that it was "dismissing the . . . complaint [the Brandeis Center] filed against the University of Pennsylvania".  A copy of this letter (the "Notice of Dismissal") is annexed hereto as **Exhibit D.**

68.    In its Notice of Dismissal, OCR noted that Section 110(h) of the Manual permits OCR to "close or dismiss an allegation(s) where a ***class action*** with the same allegation(s) has been filed against the same recipient with a state or federal court and the relief sought is the same as would be obtained if OCR were to find a violation regarding the allegation(s)" (emphasis added).

69.    The Notice of Dismissal conceded that the parallel federal complaint was "not filed as a class action," but asserted that, because the complaint "contains the same allegations as those filed with OCR" and "seeks systemic relief," OCR was "dismissing this OCR complaint pursuant to [Case Processing Manual] Section 110(h)."

70.    Prior to the January 2, 2024 Notice of Dismissal, the Department did not provide the Brandeis Center with any notice that the Department was considering dismissing the Brandeis Center's complaint and ending the Department's investigation.

71.    The Department did not provide the Brandeis Center with an opportunity to be heard as to why dismissal was improper either before or after the Department issued the Notice of Dismissal.

72.    While most prior versions of the Manual, including the one issued in November 2018, afforded complainants the right to appeal dismissals of their complaints,[38] the current version of the Manual, issued in July 2022, eliminated that provision and does not provide for any sort of review or appeals process.  *See* Ex. C.

73.    Accordingly, the Brandeis Center had no opportunity to appeal the Department's decision to dismiss the Brandeis Center's complaint and the cessation of the Department's investigation into anti-Semitic discrimination and harassment at Penn.

## RELEVANT LEGAL FRAMEWORK

74.    The Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, requires that courts "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

75.    Agency rules are arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

---

[38]    *See, e.g.*, "U.S. Department of Education Office for Civil Rights Case Processing Manual (CPM)" (Nov. 19, 2018) at 21 (§ 307), available at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm-20181119.pdf.

76.     In reviewing agency action under the arbitrary-and-capricious standard, this Court must confirm that an agency fulfilled its duty to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43 (citation and internal quotation omitted).  This Court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citation omitted).

77.     To conduct that inquiry, this Court needs "judicially manageable standards"—that is, "law to apply." *Salazar* v. *King*, 822 F.3d 61, 76 (2d Cir. 2016).

78.     The APA further requires that federal agencies publish, in the Federal Register, notice of proposed rule making, along with "the time, place, and nature of public rule making proceedings." 5 U.S.C. §§ 553(b), (d).  The APA defines a "rule" as any "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).  Before adopting a proposed rule, agencies must consider all relevant written data, views, or arguments submitted by interested persons.  5 U.S.C. §§ 553(c), (d).

79.     5 U.S.C. § 702 creates a cause of action in federal court for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

80.     Title VI of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

81.    Federal law "direct[s]" the DOE, among other departments and agencies, "to effectuate the provisions of [Title VI] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken."  42 U.S.C. § 2000d–1

82.    Pursuant to DOE regulations, "[a]ny person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this part may by himself or by a representative file with the responsible Department official or his designee a written complaint."  34 C.F.R. § 100.7(b).

83.    DOE's regulations further state that "[t]he responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part. The investigation should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part."  34 C.F.R. § 100.7(c).

## **CAUSES OF ACTION**

**Count I:  Violations of 5 U.S.C. § 551, *et seq.*:**
**Arbitrary and Capricious Dismissal of the Complaint**
**(for Injunctive and Declaratory Relief)**

84.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

85.    OCR's dismissal of the investigation of the Brandeis Center complaint that it had already initiated was arbitrary and capricious in violation of 5 U.S.C. § 702.

86.    OCR's Case Processing Manual "create[s] binding norms as to how OCR conducts investigations." *Pearl River Union Free Sch. Dist.* v. *King*, 214 F. Supp. 3d 241, 257 (S.D.N.Y. 2016) (citation and internal quotation omitted).  And "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures," even if "the internal procedures are possibly more rigorous than otherwise would be required." *Montilla* v. *I.N.S.,* 926 F.2d 162, 167 (2d Cir. 1991) (brackets omitted).

87.    OCR's abandonment of its investigation and dismissal of the Brandeis Center complaint disregarded the careful limits on agency discretion set forth in the Manual.

88.    As indicated, OCR's regulations *require* an investigation to proceed whenever a complaint "indicates a possible failure to comply" with OCR's anti-discrimination standards.  34 C.F.R. § 100.7(c).

89.    The Manual divides the circumstances under which OCR will "close or dismiss an allegation" into *mandatory* and *discretionary* scenarios.  Ex. C § 110.

90.    Parallel ***class actions*** fall within the category of circumstances under which a discretionary closure is permissible.  Ex. C § 110(h).  But the case at hand involves a parallel judicial proceeding that is ***not*** a ***class action***—and is therefore *not* a circumstance in which OCR can close a well-founded investigation.

91.    Still, OCR dismissed the investigation, and did so because of a parallel judicial proceeding that is not a class action.  In so doing, OCR reached beyond the limits of its discretion as cabined by the Manual.  That overreach is arbitrary, capricious, and violative of law.

92.     Plaintiffs in the *Yakoby* action include in their complaint a number of the factual allegations set forth in the Brandeis complaint.  However, the two complaints are dissimilar in certain key respects.  As a private civil suit, the *Yakoby* plaintiffs may not pursue the same relief that could be pursued through a Department of Education investigation, could not pursue the same theories of liability, and will be subject to a different legal standard on their Title VI cause of action.

93.     *First*, there are remedies available to the Department of Education for Title VI violations that are not available to the *Yakoby* plaintiffs.  For example, private plaintiffs may not seek an end to federal funding.  While federal law provides for the "termination of or refusal to grant or to continue" further federal financial assistance where noncompliance of Title VI or its regulations is found, 42 U.S.C. § 2000d–1, the Supreme Court has held that there is no "freestanding private right of action to enforce regulations promulgated under [42 U.S.C. § 2000d–1]."  *Alexander* v. *Sandoval*, 532 U.S. 275, 293 (2001).

94.     *Second*, private litigants may not pursue the same theories of liability that can be pursued by the Department of Education.  The *Yakoby* action does not—and cannot—seek to enforce disparate-impact regulations promulgated under Title VI.  The Supreme Court has held that "there is no freestanding private right of action to enforce regulations promulgated under § 602," including disparate-impact regulations.  *Sandoval*, 532 U.S. at 293.  The only way to enforce the Department's disparate-impact regulations is through an investigation by OCR.  There is no alternative remedy.

95.     *Third*, the *Yakoby* plaintiffs will proceed under a different and more restrictive legal standard than that used by the Department of Education.  Private plaintiffs

cannot pursue claims against federally funded schools unless those schools "act[] with deliberate indifference to known acts of harassment in [their] programs or activities," and only where such harassment proves "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis Next Friend LaShonda D.* v. *Monroe County Bd. Of Educ.*, 526 U.S. 629, 633 (1999). By contrast, OCR holds recipient schools "responsible for taking prompt and effective action to stop racial harassment and prevent its recurrence."[39] This is different from the "deliberate indifference" standard that federal courts apply in private civil actions.

96.    Compounding the problem is the OCR's failure to provide a sufficiently well-reasoned explanation for its dismissal of the Brandeis Center complaint.

97.    OCR offered only four sentences explaining its decision. It noted that Section 110(h) of the Manual permits OCR to "close or dismiss an allegation(s) where a *class action* with the same allegation(s) has been filed against the same recipient with a state or federal court and the relief sought is the same as would be obtained if OCR were to find a violation regarding the allegation(s)." Ex. D at 1 (emphasis added). It conceded that the parallel federal complaint was "not filed as a class action," but stated that because the complaint "contains the same allegations as those filed with OCR" and "seeks systemic relief," OCR was "dismissing this OCR complaint pursuant to CPM Section 110(h)." *Id.*

98.    That statement does not explain how seeking systemic relief turns a non-class action into the functional equivalent of a class action. OCR's reasoning thus "fails to

---

[39]    Congressional Research Service, "Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964" at 20 n.158, (April 4, 2019), available at https://crsreports.congress.gov/product/pdf/R/R45665 (quoting U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Platteville Public Schools, at 3 (Nov. 20, 2013)).

consider pertinent aspects of the problem," *Littlefield* v. *U.S. Department of the Interior*, 85 F. 4th 635, 643 (1st Cir. 2023) (brackets removed), which also renders it arbitrary and capricious.

99.     OCR's dismissal was also arbitrary and capricious because it was an unreasonable reversal in decision-making.

100.     Shifts in agency policy require reasoned explanations.  "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *F.C.C.* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  To the contrary, they must "show that there are good reasons for the new policy."  *Id*.

101.     OCR offered no justification for its *ad hoc* decision to ignore the Manual's policy of declining to dismiss investigations on the basis of non-class action parallel proceedings.  As such, the dismissal is arbitrary and capricious.

### Count II:  Violations of 5 U.S.C. § 551, *et seq.*:
### Failure to Comply with Notice and Comment Requirements
### (for Injunctive and Declaratory Relief)

102.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

103.     This Court is empowered by 5 U.S.C. §§ 702, 706 to hold unlawful and to set aside final agency action adopted without adhering to the APA's procedural requirements.

104.     5 U.S.C. § 553 mandates that agencies afford notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal.  "Failure to abide by these requirements renders a rule procedurally invalid."  *New Hampshire Hospital Association* v. *Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

105. Under Section 307 of OCR's November 2018 Manual, parties possessed the right to appeal dismissals of their complaints.[40]

106. But, in July 2022, OCR eliminated that provision from its Manual—and did so without undergoing notice and comment. *See* Ex. C. In so doing, OCR shifted and affected rights and interests of complainants, all in violation of 5 U.S.C. Chapter 5, §§ 551, *et seq.*

107. The elimination of Section 307 of the November 2018 Manual cannot be construed as falling within any of the three recognized exemptions to the APA's notice-and-comment requirement. Those three exemptions—interpretive rules, general policy statements, and rules of agency organization, procedure, or practice—must each be "narrowly construed and only reluctantly countenanced." *New Jersey* v. *EPA*, 626 F. 2d 1038, 1045 (D.C. Cir. 1980).

108. The right to appeal is not an interpretive rule, which merely explicates Congress's desires without adding substantive content to the underlying regulation. Nor is it a general policy statement, which allows agencies to announce tentative intentions for the future without binding themselves.

109. Finally, the right to appeal is not a rule of agency organization, procedure, or practice—a limited carveout that applies only to internal house-keeping measures organizing agency activities that do not alter the rights or interests of parties, and merely alter the manner in which the parties present themselves or their viewpoints to the agency. Rather, elimination of the right of appeal prevents parties from presenting disputes entirely.

---

[40] "U.S. Department of Education Office for Civil Rights Case Processing Manual (CPM)" (Nov. 19, 2018) at 21 (§ 307), available at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm-20181119.pdf.

**Count III:  Violations of 5 U.S.C. § 551, *et seq.*:**
**Due Process Failure to Offer Appellate Review of Dismissed Complaint**
**(for Injunctive and Declaratory Relief)**

110.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111.    The Due Process Clause "protect[s] civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances."  *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982).

112.    The Supreme Court has made clear that "there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause."  *Paul* v. *Davis*, 424 U.S. 693, 710 (1976).

113.    Those protected liberty or property interests "are normally not created by the Constitution," but by "an independent source such as state statutes or rules entitling the citizen to certain benefits."  *Goss* v. *Lopez*, 419 U.S. 565, 572-573 (1975) (citation and internal quotations omitted); *see also Wilkinson* v. *Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'" or "from an expectation or interest created by state laws or policies.").

114.    The Department of Education's regulations function as one such source. Those regulations mandate an OCR investigation whenever a complaint "indicates a possible failure to comply" with the requirements of Title VI.  *See* 34 C.F.R. 100.7(c).  As a result, parties that allege discrimination in violation of Title VI wield a constitutionally protected interest in the investigation of such discrimination.

115.    Plaintiffs indicated a credible Title VI violation, and OCR initiated an investigation.  By improperly abandoning that investigation, OCR deprived Plaintiffs of the right to an investigation—and did so without allowing for any appeal.

116.    The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews* v. *Elridge*, 424 U.S. 319, 333 (1976) (citation and internal quotation omitted).  But no such opportunity remains in the wake of OCR's elimination of the right to appeal the dismissal of a complaint.  And that is because of the unique nature of the "appeal" at issue, which represents a complainant's *exclusive* opportunity to be heard on the question of an investigation's closure.

117.    Complainants did not receive any notification when OCR was considering closing or dismissing its complaint on the basis of a parallel judicial proceeding, and had no opportunity to be heard after OCR effected the dismissal.  As a result, complainants lacked any opportunity to contest the closure or dismissal.

## PRAYER FOR RELIEF

118.    WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor, and against Defendants, and:

a)    Declare that Defendants' dismissal of the Brandeis Center's Penn complaint was arbitrary, capricious, and violative of the Administrative Procedure Act;

b)    Declare unlawful under the Administrative Procedure Act any other complaints dismissed, since October 7, 2023, under Section 110(h) of the OCR Manual, based on misapplication of the provision regarding class action lawsuits;

c)      Declare that Defendants' elimination of the Section 307 appeal right in the November 2018 Manual was not in accordance with law and beyond statutory and regulatory authority, in violation of the Administrative Procedure Act;

d)      Preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with them from refusing to reopen and fully investigate (in accordance with the complaint-initiated investigation procedures in the applicable version of the Manual) the underlying Brandeis Center Penn complaint unlawfully dismissed pursuant to Section 110(h) of the Manual, as well as any other complaints wrongfully dismissed since October 7, 2023, pursuant to Section 110(h) of the Manual;

e)      Preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with them from dismissing any new complaint based on the prior dismissal under Section 110(h) of the Manual;

f)      Declare that Defendants' elimination of the Section 307 appeal right in the November 2018 Manual violated the Due Process Clause;

g)      Preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with them from removing the appeal right provided by Section 307 of the November 2018 Manual;

h)    Preliminarily and permanently enjoin Defendants from violating Department of Education regulations and the notice and comment requirements of the Administrative Procedure Act in the development of any provisions in future manuals;

i)    Preliminarily and permanently enjoy Defendants from issuing new versions of the Manual, or implementing material modifications to the Manual, without undertaking notice and comment and all other requirements of the Administrative Procedure Act;

j)    Award Plaintiff their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

k)    Order such other and further relief that this Court may deem just and proper.

Respectfully Submitted,

Dated: July 9, 2024

*/s/ Mitchell D. Webber*
Mitchell D. Webber (D.C. Bar # 1024005)
Andrew J. Topal (D.C. Bar # 1659154)*
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
mwebber@paulweiss.com
atopal@paulweiss.com

Brad S. Karp*
Gregory F. Laufer*
Robert N. Kravitz*
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

Facsimile: (212) 757-3990
bkarp@paulweiss.com
glaufer@paulweiss.com
rkravitz@paulweiss.com

\* *pro hac vice* application and/or
Application for Admission forthcoming

*Attorneys for Plaintiffs The Louis D.
Brandeis Center, Inc. and Jewish
Americans for Fairness in Education*