**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

THE LOUIS D. BRANDEIS CENTER, INC.
and JEWISH AMERICANS FOR FAIRNESS
IN EDUCATION,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF EDUCATION,
MIGUEL CARDONA in his official capacity
as Secretary, U.S. Department of Education,
and CATHERINE LHAMON in her official
capacity as Assistant Secretary, U.S.
Department of Education,

      Defendants.

Civil Action No. 1:24-cv-01982 (RC)

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

**ORAL HEARING REQUESTED**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND.....................................................................................4

    A.    The Parties.......................................................................................4

    B.    Antisemitism at Penn.......................................................................5

    C.    The Brandeis Center Administrative Complaint .............................7

    D.    Civil Lawsuit Against Penn..............................................................8

    E.    OCR's Dismissal of the Brandeis Center's Complaint ...................8

    F.    Harassment of Jewish Students at Penn Continues ........................9

APPLICABLE LEGAL STANDARDS .......................................................................11

ARGUMENT........................................................................................................12

    I.    COUNT I: THE COMPLAINT PROPERLY ALLEGES THAT THE
DEPARTMENT'S DISMISSAL OF THE BRANDEIS CENTER
ADMININSTRATIVE COMPLAINT WAS ARBITRARY AND CAPRICIOUS .....12

        A.    A Private Civil Action Against Penn Is Not an Adequate Alternative Remedy
for Plaintiffs...............................................................................13

        B.    OCR Lacks Discretion to Violate Its CPM ....................................17

        C.    An Individual Action Seeking "Systemic Relief" Is Not a "Class Action" ....19

    II.    COUNT II:  THE COMPLAINT ADEQUATELY ALLEGES THAT THE
DEPARTMENT VIOLATED THE APA BY NOT PROVIDING NOTICE AND
COMMENT WHEN IT ELIMINATED ALL APPEAL RIGHTS IN REGARD TO
THE DISMISSAL OF ITS INVESTIGATIONS .......................................................22

        A.    Plaintiffs Have Standing.................................................................22

        B.    Appellate Rights Are Substantive, Not Procedural ........................26

    III.    COUNT III: THE COMPLAINT ADEQUATELY ALLEGES THAT OCR'S
TERMINATION OF ITS INVESTIGATION OF PENN WITHOUT ANY
OPPORTUNITY FOR THE BRANDEIS CENTER TO BE HEARD WAS A
VIOLATION OF DUE PROCESS................................................................................28

CONCLUSION.....................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander* v. *Sandoval*,
532 U.S. 275 (2001)................................................................................................14

*Am. Fed. of Labor & Cong. of Indus. Orgs.* v. *NLRB*,
57 F.4th 1023 (D.C. Cir. 2023)..........................................................................26, 27

*Attias* v. *Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017)................................................................................12

*Bd. of Regents of State Colls.* v. *Roth*,
408 U.S. 564 (1972)................................................................................................29

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)................................................................................................11

*Bello* v. *Gacki*,
94 F.4th 1067 (D.C. Cir. 2024)..............................................................................29

*Bochra* v. *Dep't of Educ.*,
Nos. 22-2903 & 23-1388, 2024 WL 808061 (7th Cir. Feb. 27, 2024)....................18

*Bowen* v. *Massachusetts*,
487 U.S. 879 (1988)..........................................................................................14, 16

*Cap. Area Immigrants' Rts. Coal.* v. *Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020).....................................................................23, 24

*Council of & for the Blind of Del. Cnty. Valley, Inc.* v. *Regan*,
709 F.2d 1521 (D.C. Cir. 1983) (*en banc*)........................................................14, 15

*Ctr. for Biological Diversity* v. *Haaland*,
849 F. App'x 2 (D.C. Cir. 2021)........................................................................22, 23

*Ctr. for Sustainable Econ.* v. *Jewell*,
779 F.3d 588 (D.C. Cir. 2015)................................................................................24

*Davis* v. *Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)................................................................................................16

*Garcia* v. *Vilsack*,
563 F.3d 519 (D.C. Cir. 2009)................................................................................13

*Harden* v. *Regional Adm'r*,
    977 F.2d 572 (4th Cir. 1992) ................................................................30

*Humane Soc'y of the U.S.* v. *Vilsack*,
    797 F.3d 4 (D.C. Cir. 2015) ..................................................................13

*Inova Alexandria Hospital* v. *Shalala*,
    244 F.3d 342 (4th Cir. 2001) ................................................................28

*Keepseagle* v. *Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) ............................................................20

*Keepseagle* v. *Vilsack*,
    102 F. Supp. 3d 306 (D.D.C. 2015) ......................................................20

*Magruder* v. *Capital One, Nat'l Ass'n*,
    540 F. Supp. 3d 1 (D.D.C. 2021) ..........................................................12

*Marlow* v. *U.S. Dep't of Educ.*,
    820 F.2d 581 (2d Cir. 1987) .................................................................18

*Mathews* v. *Eldridge*,
    424 U.S. 319 (1976) .............................................................................29

*Nat'l Council of Agric. Emps.* v. *U.S. Dep't of Lab.*,
    No. 22-cv-3569, 2024 WL 324235 (D.D.C. Jan. 29, 2024) ..................22

*Nat'l Fed'n of the Blind* v. *U.S. Dep't of Educ.*,
    407 F. Supp. 3d 524 (D. Md. 2019) ...........................................24, 25, 26

*Nat'l Sec. Couns.* v. *C.I.A.*,
    931 F. Supp. 2d 77 (D.D.C. 2013) ........................................................28

*Neder* v. *United States*,
    527 U.S. 1 (1999) .................................................................................20

*Payne* v. *Becerra*,
    No. 22-cv-00869, 2023 WL 3376630 (D.D.C. May 11, 2023), *aff'd*,
    No. 23-5131, 2024 WL 409404 (D.C. Cir. Feb. 1, 2024) .....................18

*Payne* v. *Vilsack*,
    No. CV 21-1571, 2023 WL 6160012 (D.D.C. Sept. 21, 2023) ..............18

*Pearl River Union Free School District.* v. *King*,
    214 F. Supp. 3d 241 (S.D.N.Y. 2016) ..................................................17

*Public Citizen* v. *Dep't of State*,
    276 F.3d 634 (D.C. Cir. 2002) ..............................................................28

*Ross* v. *Blake*,
    578 U.S. 632 (2016)....................................................................................20

*Sanchez* v. *Off. of State Superintendent of Educ.*,
    45 F.4th 388 (D.C. Cir. 2022)......................................................................11

*Stone* v. *INS*,
    514 U.S. 386 (1995)....................................................................................20

*Wash. Legal Found.* v. *Alexander*,
    984 F.2d 483 (D.C. Cir. 1993)......................................................................14

*Women's Equity Action League* v. *Cavazos*,
    906 F.2d 742 (D.C. Cir. 1990).................................................................14, 30

*Yakoby* v. *Univ. of Penn.*,
    No. 2:23-cv-04789-MSG (E.D. Pa. Dec 05, 2023) ........................................8

**Statutes**

5 U.S.C. § 553(b)(A) .....................................................................................27

5 U.S.C. § 702............................................................................................12

5 U.S.C. § 706............................................................................................12

42 U.S.C. § 2000d–1.....................................................................................14

**Other Authorities**

Class Action, Black's Law Dictionary (12th ed. 2024).......................................19

Fed. R. Civ. P. 8(a)(2)...................................................................................11

Fed. R. Civ. P. 23(e).....................................................................................20

Fed. R. Civ. 12(b)(6).....................................................................................11

Federal Rules of Civil Procedure Rule 23 ..............................................*passim*

## PRELIMINARY STATEMENT

The Department of Education is abdicating its congressionally mandated responsibility to investigate egregious violations of the nation's civil rights laws at one of the country's most prestigious universities.

As has been well-documented in the media and in congressional hearings, the University of Pennsylvania ("Penn") has become a center of anti-Jewish violence, harassment, and intimidation that, after simmering for years, gained national attention following the horrific October 7, 2023 massacre of American and Israeli citizens by Hamas, and that continues unabated to this day.  Plaintiff The Louis D. Brandeis Center, Inc. (the "Brandeis Center"), submitted an administrative complaint—following the procedures set forth by the Department of Education's Office for Civil Rights ("OCR," and collectively with the Department of Education, the "Department")—against Penn that was so compelling that, within a matter of days, the Department notified the Brandeis Center that it had accepted the complaint for investigation.

Shortly thereafter, however, the Department dismissed the complaint in clear violation of *its own* Case Processing Manual (the "CPM").  The Department dismissed the Brandeis Center complaint after two students brought an individual action against Penn, even though the CPM permits dismissals only where a parallel *class action* has been filed against a school under investigation by OCR.

Defendants now claim that, even though the Department did precisely what the Brandeis Center alleges in its Complaint here, the Brandeis Center cannot challenge this violation of the Department's own CPM on the professed ground that the Department's conduct with respect to its enforcement of the civil rights laws is somehow immune from scrutiny.

Defendants are wrong.  Federal law imposes on the Department an obligation to investigate and remedy violations of the civil rights laws, and the Department's own CPM mandates how and

1

when the Department may dismiss an investigation it has agreed to undertake.  Contrary to what Defendants now argue in their motion, the Department is not free to enforce the civil rights laws in whatever manner it chooses, or not at all, without judicial review.  And, the bases Defendants have proffered in an attempt to shield themselves from such review are misguided:

*First*, the Defendants seek dismissal of Count I of the Complaint—which alleges that the Department's termination of its investigation of Penn was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA")—under the narrow exception to APA review in which there is an "adequate" and "available" alternative remedy.  This argument fails.

Private lawsuits under Title VI are not adequate or available because, among other reasons, they do not provide the complainants with the primary relief available through the administrative process:  the cessation of federal funding.  The threat of cutting off federal funding is a potent enforcement tool unique to OCR, and its availability is precisely the reason that victims of civil rights violations often turn to the Department for vindication of their rights.  Defendants nonetheless claim the CPM grants discretion to OCR to dismiss complaints whenever it wants.  But the opposite is true:  the CPM explicitly cabins OCR's discretion, and the Department is not at liberty to unilaterally disregard, much less violate, its own rules.

Defendants' argument that OCR has the discretion to twist the meaning of the well-known and long-used term "class action" into any claim seeking "systemic relief" is also incorrect.  The term "class action," as used in the CPM (and in most any other context), is a plain and unambiguous reference to lawsuits that are subject to the strict requirements of Rule 23 of the Federal Rules of Civil Procedure and its state law equivalents.  Indeed, there are important reasons OCR would dismiss a complaint only in the case of a parallel class action—and not in the case of a parallel individual action, as was the case here.  Among other things, in a class action under Rule 23, the

court is required to review and approve any settlement of the action as being in the best interests of the class, after all absent members of the class have been afforded notice of the settlement terms and an opportunity to be heard—a protection entirely absent in an individual action, which the plaintiff can choose to settle for relief that benefits himself alone.

*Second*, Defendants move for dismissal of Count II—which alleges that the Department violated the APA by revising its CPM and removing all rights to appeal a Department decision to terminate an investigation without providing notice and comment—on the ground that Plaintiffs purportedly lack standing to assert the claim, and for failure to state a claim for relief. These arguments, too, are wrong. Plaintiffs suffered a concrete injury resulting from the Department's decision to eliminate all appeal rights without any notice and comment, and it was a violation of the APA to eliminate such an important right without notice and comment. Moreover, the Brandeis Center has used and relied on the OCR remedy over 20 times. The Brandeis Center would be prevented from pursuing its core mission if it were forced to bring actions in federal court or to abandon its other OCR complaints each time an unrelated plaintiff filed a federal lawsuit against the same educational institution.

*Third*, Defendants move for dismissal of Count III—which alleges a due process violation because the Department deprived Plaintiffs of any opportunity to challenge the dismissal of their complaint, either before or after the Department abruptly dismissed it—on three grounds: (i) a purported lack of standing; (ii) a purported lack of a liberty or property interest; and (iii) failure under the *Mathews* v. *Eldridge* balancing test. These arguments, too, are meritless.

Plaintiffs have standing to pursue their claims. They were directly and concretely injured by Defendants' decision to deny them an opportunity to challenge the Department's abrupt termination of its Penn investigation. Plaintiffs also have a liberty interest in ensuring that their

allegations of pervasive antisemitism on the part of universities like Penn are properly investigated by the Department and not simply dismissed on a whim and in direct violation of federal law. And the *Mathews* v. *Eldridge* balancing test weighs in Plaintiffs' favor, not against it, because of the important individual and societal interests at stake in the Department's abrupt and unlawful termination of its investigation of Penn's failure to stem the rising tide of antisemitism on its campus.

For these reasons, as further elaborated below, the Department's motion to dismiss should be denied in its entirety.

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff, the Brandeis Center, is a nonprofit, non-partisan corporation established in 2011 to advance the civil and human rights of the Jewish people and to promote justice for all. Compl. ¶ 18. The Brandeis Center engages in research, education, and legal advocacy to combat antisemitism on college and university campuses and elsewhere. *Id*.

Plaintiff Jewish Americans for Fairness in Education ("JAFE") is a national membership organization that is housed within and operated by the Brandeis Center. Compl. ¶ 20. JAFE's mission, like that of the Brandeis Center, is to advance the civil and human rights of the Jewish people and promote justice for all, and, in particular, to fight antisemitism and discrimination and ensure fairness in education. *Id*. JAFE's members consist of Jewish students, parents, alumni, and faculty who have been victims of antisemitism and discrimination. *Id*. JAFE's membership includes Penn undergraduate, graduate, and law students, as well as Penn faculty.[1] *Id*.

---

[1]    Because of its affiliation with the Brandeis Center, members of JAFE also become members of the Brandeis Center. While all members of JAFE are also members of the Brandeis Center, for simplicity they are referred to here simply as JAFE members.

Defendants are the U.S. Department of Education, U.S. Secretary of Education Miguel Cardona, and Catherine Lhamon, Assistant Secretary, Office for Civil Rights, U.S. Department of Education.  Mr. Cardona and Ms. Lhamon are sued in their official capacities.  Compl. ¶ 26.

### B.    Antisemitism at Penn

The Complaint sets forth, and we recount here, only a few of the many well-publicized incidents of anti-Jewish hate and discrimination taking place at Penn in just the past year.

The Fall 2023 semester began at Penn with a swastika painted on a classroom wall.  Compl. ¶ 36.  The next week, an individual broke into Penn's Hillel, destroyed furniture, and shouted obscenities about Jews.  Compl. Ex. A, at 6.  Penn's Hillel, located in the center of campus, is the focal point of Jewish life at Penn, reaching over 1,100 of the roughly 1,300 Jewish students.  The following week, the Sukkah—a tent-like structure used to celebrate the Jewish holiday of Sukkot—was vandalized with graffiti at Penn's Chabad house—another popular and well-known Jewish institution on campus.  Compl. ¶ 41.

In the midst of these attacks, and the day after the Hillel break-in, an event called the "Palestine Writes Festival" began, sponsored and funded by Penn.  Compl. ¶ 35.  Billed as a literary event featuring "productions from Palestinian writers and artists," its true intent, in the words of one speaker, was to "to de-Zionize our campuses."  Compl. Ex. A, at 9.  Despite being warned about the dangers of being associated with and sponsoring the Festival, Penn failed to distance itself from the event, its participants, or its mission—to make Penn unwelcoming to Jews—in any meaningful way.   Compl. ¶ 39.  Penn knew that at least 25 speakers slated to participate in the Festival had shared virulently antisemitic views.  Compl. Ex. A, at 7.  For example, Susan Abulhawa, a co-chair of the festival, has stated that "[e]very Israeli, whether in a synagogue, a checkpoint, settlement, or shopping mall is a coloniser [*sic*].  The whole country is one big, militarized tumor."  Compl. Ex. A, at 7.  Randa Abdel-Fattah, who presented twice at the

Festival, has said that "Israel is a demonic, sick project, and I can't wait for the day we commemorate its end." Compl. Ex. A, at 8. Other speakers who were *neither* Palestinian writers nor artists—but who were also virulently anti-Israel—were also invited to speak. Compl. Ex. A, at 9–10. Roger Waters, a former member of the British rock band Pink Floyd, was invited and presented despite—or because of—his long track record of Israel-bashing and antisemitism, including recently wearing a Nazi uniform on stage. Compl. Ex. A, at 10.

As expected, the Festival featured ferocious antisemitism. Three different festival speakers compared Israel to Nazi Germany. Compl. Ex. A, at 13. The festival screened a film presenting Israeli soldiers as bloodthirsty monsters—recalling the blood libel claims that have been made against Jews since the Middle Ages—and an entire panel was dedicated to the works of terrorist Ghassan Khanafani, who has been linked to the massacre at Lod Airport, in which 26 travelers were murdered. Compl. Ex. A, at 10–11.

This school-sponsored hate-fest was a harbinger for the antisemitism that exploded at Penn following Hamas' October 7 attack on Israel. Rather than expressing compassion or remorse for the 1,200 people that had just been slaughtered, raped, burned, and mutilated, Penn students and faculty marched through campus chanting: "There is only one solution: intifada resolution" (deliberately echoing Hitler's "final solution"); "from the river to the sea" (meaning that the entire land of Israel should be emptied of Jews and occupied by Palestinians) and "intifada intifada" (a call for terrorism and deadly violence; two such "intifadas" were launched in the 1980s and 2000s and consisted of the murder of hundreds of Israeli civilians through suicide bombings and other attacks in cafes, restaurants, schools, and public buses). Compl. Ex. A, at 16.

Penn faculty joined in. In a tweet in Arabic, Professor Huda Fakhreddine praised the Oct. 7 massacre, writing: "While we were asleep, Palestine invented a new way of life." Compl. Ex. A,

at 19.  Professor Ahmad Almallah spoke at an on-campus rally and concluded his speech by chanting "intifada, intifada, intifada"—a call for the murder of Israeli civilians.  Compl. Ex. A, at 19.  Almallah also called for a "revolution" and stated, "there is only one solution," namely, the elimination of Jews from Israel.  Compl. Ex. A, at 19.  Making matters worse, Penn professors attempted to force Jewish students to attend the Palestine Writes Festival, despite its antisemitic history and its occurrence on a Jewish holiday.  Compl. Ex. A, at 11.

All the while, antisemitic vandalism became commonplace at Penn.  The property next door to a Jewish fraternity was vandalized with graffiti that read "The Jews R Nazis."  Compl. ¶ 46.  A Penn library staffer tore down posters of Israeli children held hostage by Hamas, and when questioned by a Penn student, yelled "F*ck you!"  Compl. ¶ 47.  A student ripped down and stole an Israeli flag from the home of an Orthodox Jewish student.  Compl. ¶ 48.  Meanwhile, Penn staff members received vile and disturbing antisemitic emails threatening violence against members of the Jewish community, specifically threatening to target Penn Hillel and Lauder College House.  Compl. ¶ 50.

Penn's administration refused to take any action to protect its Jewish students from this onslaught.  The University remained silent about the Penn community's celebration of the October 7 Hamas massacre.  Compl. Ex. A, at 3.  Former President Magill testified at a congressional hearing that "calls for the genocide of the Jewish people" would not necessarily be a violation of Penn's code of conduct.  Compl. ¶ 53.  And despite repeated violations by faculty and students of Penn's code of conduct, the University failed to discipline offenders in any meaningful way.

## C.    The Brandeis Center Administrative Complaint

Confronting Penn's deafening silence in the face of this tidal wave of antisemitism, on November 9, 2023, in accordance with OCR's regulations and procedures, the Brandeis Center submitted a complaint to OCR alleging violations by Penn of Title VI of the Civil Rights Act of

1964 ("Title VI"), and seeking the implementation of remedial measures that would protect Jewish students from the current, hostile campus environment. Compl. ¶ 60. The Brandeis Center sought the appointment of an independent investigator, enforcement of the University's code of conduct, and the implementation of mandatory training for administrators and professors on antisemitism, among other remedial measures. Compl. Ex. A, at 25–26.

Recognizing the severity and urgency of the situation, less than a week after filing, OCR initiated an investigation into the allegations set forth in the Brandeis Center's complaint. OCR notified the Brandeis Center of the investigation and stated that "OCR will ensure that its investigation is legally sufficient and fully responds to the allegation in accordance with the provisions of the Case Processing Manual." Compl. Ex. B, at 1.

### D. Civil Lawsuit Against Penn

On December 5, 2023, two undergraduate Penn students, represented by a different law firm, filed a lawsuit in the U.S. District Court for the Eastern District of Pennsylvania against the University of Pennsylvania. Compl. ¶ 64. The lawsuit, captioned *Yakoby* v. *Univ. of Penn.*, No. 2:23-cv-04789-MSG (E.D. Pa. Dec 5, 2023), was amended in March 2024 to add a not-for-profit corporation, Students Against Antisemitism, as a plaintiff. *See* Amended Complaint, *Yakoby*, 23-cv-04789, ECF No. 28. Plaintiffs in the *Yakoby* action asserted claims for violations of Title VI, Breach of Contract, and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Laws. Compl. ¶ 65. Plaintiffs in *Yakoby* asserted their claims as individuals, not as members of a class or as a class action.

### E. OCR's Dismissal of the Brandeis Center's Complaint

On January 2, 2024, OCR notified the Brandeis Center that it was "dismissing the . . . complaint . . . [p]ursuant to Section 110(h) of the Case Processing Manual." Compl. Ex. D, at 1; Compl. ¶ 67–68.

Section 110(h) of the CPM permits OCR to "close or dismiss an allegation(s) where a ***class action*** with the same allegation(s) has been filed against the same recipient with a state or federal court and the relief sought is the same as would be obtained if OCR were to find a violation regarding the allegation(s)."  Compl. ¶ 68 (emphasis added).

In notifying the Brandeis Center of this dismissal, OCR conceded that the parallel federal complaint was "not filed as a class action," but asserted that, because the complaint "contains the same allegations as those filed with OCR" and "seeks systemic relief," OCR was "dismissing this OCR complaint pursuant to CPM Section 110(h)."  Compl. Ex. D, at 1.  The Department did not provide the Brandeis Center with any notice that the Department was considering dismissing the complaint or terminating its investigation into Penn.  The Department also did not provide the Brandeis Center with an opportunity to be heard as to why dismissal was improper, either before or after the Department issued the Notice of Dismissal.  Compl. ¶ 69–71.

## F.    Harassment of Jewish Students at Penn Continues

The Department's dismissal of the Brandeis Center's complaint gave the green light to anti-Jewish agitators at Penn to continue their campaign of violence, intimidation, and discrimination against Jewish students, and signaled to the Penn administration that there will be no consequences for its failure to curtail the hatred directed at Penn's Jewish students.

Indeed, last Spring, despite admitting that demonstrations and encampments at Penn "violate[d] the University's facilities policies," and that protestors were "harassing and intimidating" members of the community in violation of Title VI and vandalizing statues with "antisemitic graffiti," Penn refused to act for over two weeks.[2]  Though the hate-spewing

---

[2]    J. Larry Jameson, *An Update to the Penn Community*, PENN OFFICE OF THE PRESIDENT (April 26, 2024), https://president.upenn.edu/announcements/update-to-penn-community; J. Larry

encampment ended, the fear and threats to Jewish students did not. Only a week later, students and community members occupied a campus building and chanted: "There is only one solution, intifada revolution."[3]

The torrent of antisemitism resumed this fall. On October 7, 2024, students and others held a rally to commemorate—not condemn—the Hamas massacre. Speakers at the rally expressed support for Hamas and Hezbollah—an Iran-sponsored terror group in Lebanon that joined the Hamas attacks shortly after October 7 by firing thousands of rockets and missiles into Israel—and in an Instagram post five days later, rally organizers called the October 7 attacks a "necessary step."[4]

Two weeks later, several locations around Penn's campus were vandalized with graffiti reading, "KILL YOUR LOCAL ZIO NAZI," "KILL ZIOS!," "SINWAR LIVES," and "SINWAR STRIKES BACK."[5]

A recent congressional report, entitled "Antisemitism on College Campuses Exposed," contains an entire section on recent antisemitic events at Penn and the failure of the Penn administration to enforce its code of conduct and discipline the offending students. These incidents include: "10 anti-Israel students disrupt[ing] a Penn Board of Trustees meeting" and "caus[ing]

---

Jameson, *A Message on Ending the Encampment*, PENN OFFICE OF THE PRESIDENT (May 10, 2024), https://president.upenn.edu/announcements/ending-the-encampment.

[3] "Antisemitism on College Campuses Exposed, Education and the Workforce Committee Releases Report," 66–67.

[4] Emily Scolnick*, Pro-Palestinian Student Activists Denounce Penn, Call Oct. 7 Hamas Attacks 'A Necessary Step,'* THE DAILY PENNSYLVANIAN (Oct. 16, 2024), https://www.thedp.com/article/2024/10/penn-philadelphia-students-for-justice-in-palestine-statement.

[5] Ben Binday, "Several locations on and around Penn's campus vandalized with derogatory, anti-Zionist 'death threat,'" The Daily Pennsylvanian, Oct. 24, 2024, https://www.thedp.com/article/2024/10/penn-vandalism-campus-signs-three-israel-palestine.

the meeting to adjourn prematurely"; "a group of protestors br[eaking] open the gate of the house of the Interim Penn President" and "caus[ing] approximately $18,000 of damage"; "involvement in the attempted occupation of Fisher-Bennett Hall"; and a "multi-day occupation of the reading room of Houston Hall"—for which the participating students received either no or minimal punishment.[6]

Despite the ongoing discrimination and harassment of Jewish students at Penn, since dismissing the Brandeis Center's complaint, the Department has taken no action and has been utterly silent on the situation at Penn.

## APPLICABLE LEGAL STANDARDS

Defendants are moving to dismiss the Complaint for failure to state a claim for relief, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and, in regard to Counts II and III, for lack of standing.

A motion to dismiss under Rule 12(b)(6) tests whether the complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. 12(b)(6). For a complaint to survive, plaintiffs need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sanchez* v. *Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 675, (2009)). In so

---

[6]  "Antisemitism on College Campuses Exposed, Education and the Workforce Committee Releases Report," Committee on Education & the Workforce, Oct. 31, 2024, pp. 64–67 *available at* https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412025.

doing, courts "must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Id.*

Establishing standing at the pleadings stage is a "low bar" that requires only that a plaintiff "'state a plausible claim' that each of the standing elements is present." *Attias* v. *Carefirst*, *Inc.*, 865 F.3d 620, 622, 625 (D.C. Cir. 2017) (citation omitted). "[G]eneral factual allegations of injury resulting from the defendant[s'] conduct" are considered sufficient to clear this bar. *Magruder* v. *Capital One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 8 (D.D.C. 2021).

## ARGUMENT

## I.    COUNT I: THE COMPLAINT PROPERLY ALLEGES THAT THE DEPARTMENT'S DISMISSAL OF THE BRANDEIS CENTER ADMININSTRATIVE COMPLAINT WAS ARBITRARY AND CAPRICIOUS

Count I of the Complaint adequately alleges that the Department unlawfully dismissed the Brandeis Center complaint. The APA provides that a "person . . . adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. The APA directs "reviewing court[s]" to "hold unlawful and set aside agency action" when it is, among other things "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The Complaint alleges that the Department's decision to dismiss the Brandeis Complaint "pursuant to CPM Section 110(h)"—which permits dismissal "[w]here a class action with the same allegation(s) has been filed"—was arbitrary and capricious and should be set aside, because the dismissal was not predicated on the filing of a parallel class action. Compl. Ex. D, at 1; Compl. Ex. C, at 12.

The Department advances three reasons for dismissal of Count I: (i) APA review is precluded because a civil suit against Penn provides an adequate alternative remedy (Mot. 10–12); (ii) the Department's investigatory decisions are committed to the Department's discretion and therefore immune from judicial review (Mot. 12–14); and (iii) the Department can reinterpret

"class action" to mean individual actions seeking "systemic relief."  Mot. 14–15.  Each argument fails.

*First*, a private civil suit against Penn is not an adequate remedy.  It does not offer the same relief as that available through the OCR's investigative and enforcement process, and civil litigants proceed under a different and more restrictive legal standard than that used by the Department.  *Second*, the CPM plainly limits the Department's discretion to dismiss cases, and the Department is not free to violate the CPM at its discretion.  And *third*, according to its plain meaning, the phrase "class action," as used in the CPM, means a class action under Rule 23.  The Department's attempt at reinterpretation is a *post hoc* rationalization for dismissal—upon which the Department may not rely—and is contradicted by the Department's own notice of dismissal provided to the Brandeis Center.

### A.    A Private Civil Action Against Penn Is Not an Adequate Alternative Remedy for Plaintiffs

The Department's argument that Plaintiffs' Complaint should be dismissed because Plaintiffs purportedly have an adequate alternative remedy—a private civil action against Penn— fails, for at least two reasons.

#### 1.    A Civil Suit Against Penn Could Not Provide the Same Relief

First, an alternative remedy is not adequate if it does not offer "the same genre" of relief.  *Garcia* v. *Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009) (internal citation omitted).  A civil action by Plaintiffs against Penn cannot obtain the same relief that is available through agency action by the Department.

The D.C. Circuit has squarely held that the alternative relief is "inadequate" for purposes of the APA when "[n]either of [the available] remedies would provide plaintiffs anything like the relief they seek."  *Humane Soc'y of the U.S.* v. *Vilsack*, 797 F.3d 4, 11 (D.C. Cir. 2015); *see also*

13

*Bowen* v. *Massachusetts*, 487 U.S. 879, 901, 905 (1988) (holding that alternative relief was inadequate because the forum lacked "the general equitable powers of a district court to grant [the] prospective relief" that plaintiffs sought).

Here, the Department may pursue the "termination of or refusal to grant or to continue" federal financial support for any recipient of federal funds, such as a university, found to be in violation of Title VI.  42 U.S.C. § 2000d–1.  Indeed, the threat of termination of federal funding is the principal advantage of pursuing administrative relief.  The seriousness of this threat encourages swift and full compliance with the Department's investigative requests and favorable resolution—usually involving the implementation of significant remedial measures to prevent recurrence—where schools are found to have run afoul of the civil rights laws.  In contrast, the Supreme Court has squarely held that, while a private cause of action exists under Title VI, private litigants may not seek the cessation of federal funding in such actions.  *Alexander* v. *Sandoval*, 532 U.S. 275, 289–90, 293 (2001) ("Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602.  We therefore hold that no such right of action exists.").[7]

The Department's cases are not to the contrary.  The "trio of cases" it cites all pre-date *Sandoval*'s bar on private suits seeking termination of federal funding.  *See Wash. Legal Found.* v. *Alexander*, 984 F.2d 483, 486 (D.C. Cir. 1993); *Women's Equity Action League* v. *Cavazos*, 906 F.2d 742, 750–51 (D.C. Cir. 1990); *Council of & for the Blind of Del. Cnty. Valley, Inc.* v. *Regan*, 709 F.2d 1521, 1532–33 (D.C. Cir. 1983) (*en banc*).  For example, in *Regan*, the D.C.

---

[7]    Section 602 is codified as 42 U.S.C. § 2000d–1.  It directs agencies to seek "the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record" of non-compliance with Title VI.  *Id.*

Circuit specifically held that a private suit *was* an adequate alternative remedy because it afforded complaints precisely the same remedies they would be "entitled to" through administrative procedures, namely: "(1) a cessation of the discriminatory practice or (2) a termination of the federal funding." 709 F.2d at 1532. That is not the situation here, because a private suit, even if successful, could no longer accomplish the "termination of the federal funding" that is available only through Department action. Accordingly, a private suit against Penn is not an adequate alternative remedy to the Brandeis Center's administrative complaint.

OCR's remedies are not a mere technicality. OCR's website currently lists 3,236 active school investigations for violations of Title VI for Race and National Origin discrimination.[8] And OCR announced that it had resolved 3,001 of the Title VI complaints it received in fiscal year 2023.[9] Even investigations that are resolved through voluntary settlements can result in significant relief for students at an affected school, including revising the school's policies and procedures and annual nondiscrimination and antiharassment training for all students and employees.

---

[8]  U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (last updated Dec. 3, 2024) [hereinafter *Pending Cases*], *available at* https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_discrimination=All&items_per_page=20&field_ois_instituti on=&field_ois_institution_type=All&field_open_investigation_date_1=&field_open_investi gation_date_2=&field_open_investigation_date=&field_open_investigation_date_3=.

[9]  U.S. Dep't of Educ., Office for Civil Rights, *Fiscal Year 2023 Annual Report to the President and Secretary of Education* 17 (2024), *available at*, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2023.pdf.

**2.** **Private Litigants Face a Different and More Restrictive Legal Standard than The Standard Used by the Department**

Moreover, private litigants in federal court proceed under a different and more restrictive legal standard than that used by the Department.  To establish a violation of Title VI, private plaintiffs must show that federally funded schools "act[ed] with deliberate indifference to known acts of harassment in [their] programs or activities," where such harassment proves "so severe, pervasive, ***and*** objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."  *Davis* v. *Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (emphasis added).  By contrast, OCR holds recipient schools responsible for "taking prompt and effective action reasonably calculated to end [any] harassment" whether or not the "student has complained, asked the school to take action, or identified the harassment as a form of discrimination."[10]  OCR also defines harassment as "conduct . . . sufficiently severe, pervasive ***or*** persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities, or privileges provided by a [school]."  *Id.* at 2.  Thus, in two key respects, private litigants bear a meaningfully higher burden than that which is required for OCR action:

1.    Private litigants must demonstrate "deliberate indifference," while OCR holds schools affirmatively responsible for stopping harassment.

2.    Private litigants must show "severe, pervasive, ***and*** objectively offensive" conduct, while OCR takes actions for "severe, pervasive ***or*** persistent" conduct.

The differing legal standards—on top of the different available remedies—demonstrate that the remedy provided by a civil action in federal court is sufficiently "doubtful" as to require APA review.  *Bowen*, 487 U.S. at 905.

---

[10]    Letter from U.S. Dep't of Educ., Office for Civil Rights to Dr. Connie K. Valenza, Superintendent, Platteville Public Schools, at 4 (Nov. 20, 2013), *available at* https://www.ed.gov/media/document/05131098-apdf.

### B.      OCR Lacks Discretion to Violate Its CPM

The Department next argues that its unlawful dismissal of the Brandeis Center's complaint is immune from judicial review because "investigations and resolutions of individual complaints" are "committed to agency discretion."  Mot. 13.  The Department points to no authority granting the Department discretion to dismiss complaints for any reason it chooses, in violation of its own manual, and in fact there is no such authority.  On the contrary, the law is clear that the Department does *not* have discretion to violate its own CPM, which provides entirely adequate "law to apply" to enable judicial review.

In *Pearl River Union Free School District*. v. *King*, the Southern District of New York rejected a nearly identical argument made by the Department that its "policy choices regarding enforcement procedures are committed to agency discretion by law."  214 F. Supp. 3d 241, 251 (S.D.N.Y. 2016).  There, a school district sued the Department, challenging OCR's issuance of a Letter of Finding that was "contrary to the provisions of the Department of Education's Case Processing Manual."  *Id.* at 248.  The court rejected the Department's argument that it had discretion to violate the CPM, holding that the CPM—and specifically the section providing "guidance as to the resolution of a complaint prior to the conclusion of an investigation"—"looks to have '[c]reated binding norms' as to how OCR conducts investigations" and that it constituted sufficient "law to apply" under the APA.  *Id*. at 257 (internal citations omitted).  "Judging the propriety of agency action in light of the relevant rules in place is appropriate work for a court, agency expertise notwithstanding."  *Id*.

Notwithstanding this clear precedent, the Department argues that it has "unreviewable" discretion as to whether "to open the administrative investigation in the first instance," "the manner of the investigation, the manner the Office attempts to voluntarily resolve the complaint if it determined a violation," and "the method by which the Office would try to obtain relief if it was

unsuccessful in reaching a voluntary resolution." Mot. 14. Maybe so. The CPM is silent, or expressly provides discretion to the Department, with respect to various investigative steps. That does not mean, however, that the Department is free to disregard the CPM where it *does* provide clear instruction. The Department cites to no legal authority purporting to grant the Department the authority to disregard and violate the clear strictures of its own CPM in dismissing complaints.

The Department's reliance on *Heckler* v. *Chaney* is misplaced. 470 U.S. 821 (1985). There, several individuals sentenced to death by lethal injection sued the FDA after it refused to initiate an enforcement action concerning the drugs to be used for the executions. *Id*. at 823. The court upheld the agency decision, finding that the relevant statutes and regulations merely "authorized" that investigative steps be taken under certain circumstances, but did not require that such steps be taken. *Id.* at 835–36. There was no allegation, as here, that the agency had bound itself to take, or refrain from taking, any particular course of action. The Department's other authorities are similarly inapt, involving challenges to various agencies' factual findings, rather than their failure to follow their own rules. *See Bochra* v. *Dep't of Educ*., Nos. 22-2903 & 23-1388, 2024 WL 808061, at *1 (7th Cir. Feb. 27, 2024) (investigation closed due to "insufficient evidence"); *Marlow* v. *U.S. Dep't of Educ*., 820 F.2d 581, 582 (2d Cir. 1987) (challenging finding that school "had not discriminated against" complainant); *Payne* v. *Vilsack*, No. CV 21-1571, 2023 WL 6160012, at *3 (D.D.C. Sept. 21, 2023) (investigation closed "due to insufficient information to enable an investigation"); *Payne* v. *Becerra*, No. 22-cv-00869, 2023 WL 3376630, at *1, 5 (D.D.C. May 11, 2023) (challenging "ineligibility determination" after "following an investigation"), *aff'd*, No. 23-5131, 2024 WL 409404 (D.C. Cir. Feb. 1, 2024).

Here, in contrast, the Department did not close its investigation because, following a reasonable investigation, it made factual findings that Penn was complying with Title VI. Rather,

the Department dismissed the complaint in express reliance on its discretion to close investigations "where a class action with the same allegation(s) has been filed against the same recipient." Compl. Ex. D, at 1. Because there was no such class action, the Department did not have the discretion to close the investigation.

### C.    An Individual Action Seeking "Systemic Relief" Is Not a "Class Action"

Finally, the Department argues that, because the CPM does not define the term "class action," that term could "encompass a broad array of systemic litigation." Mot. 15. This *post hoc* rationalization of the Department's action strains credulity and should be rejected.

As an initial matter, it is a long-standing and well-established rule of construction that when undefined terms have a "well-known meaning . . . in the law of this country," the term is "presumed to have been used in that sense." *Neder* v. *United States*, 527 U.S. 1, 22 (1999) (quoting *Standard Oil Co. of N.J.* v. *United States*, 221 U.S. 1, 59 (1911)). "Class action" is such a term. Black's Law Dictionary defines "class action" as a "lawsuit in which the court authorizes a single person or a small group of people to represent the interests of a larger group," and notes that Rule 23 of the Federal Rules of Civil Procedure establishes the "prerequisites for maintaining a class action." CLASS ACTION, Black's Law Dictionary (12th ed. 2024). Nowhere is a "class action" defined as any matter that seeks "systemic relief," and the Department does not cite to any such definition.

If the Department wanted to allow itself the discretion to dismiss an investigation following the filing of an individual action seeking "systemic relief," it could have done so. In fact, prior versions of the CPM allowed for just that.[11] That the CPM no longer allows for dismissal where

---

[11] *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Case Processing Manual at 11, § 110(j) (2020) *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20202608.pdf (allowing dismissal when "[t]he same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant

there is a similar, pending individual action reflects a conscious policy choice. *Cf. Stone* v. *INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Ross* v. *Blake*, 578 U.S. 632, 639–41 (2016) (concluding mandatory nature of disputed provision was reinforced by its history, where it replaced a weaker precursor). The Department cannot simply reverse its prior decision and revise the CPM —*sub silentio* and without notice or explanation—by redefining the term "class action."

Indeed, there is an important substantive rationale underlying the CPM's allowance for dismissal for parallel class actions and not for parallel individual actions (no matter the relief sought). Class actions provide a host of protections to absent class members that are not available in individual lawsuits. "Various class action procedures protect class members from being taken advantage of by class representatives, including the requirement that class representatives 'fairly and adequately protect the interests of the class,' and the requirement that a court ensure that any settlement is 'fair, reasonable, and adequate.'" *Keepseagle* v. *Perdue*, 856 F.3d 1039, 1048 (D.C. Cir. 2017) (quoting Fed. R. Civ. P. 23). "[C]ourt review and approval are ***essential*** to assure adequate representation of class members who have not participated in shaping the settlement." Fed. R. Civ. P. 23(e) advisory committee's note to 2003 amendment (emphasis added). No such protections for absent class members exist for individual actions, regardless of the relief sought or whether there is an organizational plaintiff. Plaintiffs in the instant matter thus lack Rule 23's "procedural protections," the "underlying purpose" of which is to "protect the rights of absent class members whose legal claims will be resolved by adjudication of the class's claims." *Keepseagle* v. *Vilsack*, 102 F. Supp. 3d 306, 312 (D.D.C. 2015). Plaintiffs in the *Yakoby* matter could settle

---

against the same recipient with a state or federal court."); *see also* Mot. 4 (citing the 2020 Case Processing Manual).

their case for monetary payment to the individual plaintiffs, or for weak remedial measures that do not address the underlying issues that have allowed for the hostile environment that has taken root at Penn, and Plaintiffs, including members of the Brandeis Center and JAFE, would have no recourse.

The Department argues that an amended complaint in *Yakoby*—filed after the Department's dismissal—which added a "membership association as a plaintiff," provides "confirmation" that it was not arbitrary for OCR to treat *Yakoby* "as akin to a class action," even though it asserted no claims under Rule 23. Mot. 15. That is not so. That a different organization is now a plaintiff in *Yakoby* is of no moment. The plaintiffs in *Yakoby* can settle for any relief (or no relief) they decide to accept, regardless of whether it benefits Jewish students at Penn generally or Plaintiffs here.[12]

OCR's own notice of dismissal to the Brandeis Center did not claim that the *Yakoby* matter was a "class action" because it sought "systemic relief." Rather, it admitted that *Yakoby* was "not filed as a class action." Compl. Ex. D, at 1. This reinforces that a "class action" is an action brought under Rule 23 (or its state law analogues), not merely any suit seeking "systemic relief." The Department's dismissal of the Brandeis Center complaint was in violation of its own CPM, was therefore unlawful, and should be reversed.

---

[12]  The Department's only citation for its assertion that a "class action" can be an individual action seeking "systemic relief" is to a treatise discussing a non-existent requirement that class actions need to be "necessary" to be certified under Rule 23. Mot. 15 (citing 2 Newberg and Rubenstein on Class Actions § 4:35 (6th ed.)). But that same treatise clearly states that "Rule 23 of the Federal Rules of Civil Procedure and its state law counterparts set forth the procedural requirements for class action lawsuits." 1 Newberg and Rubenstein on Class Actions § 1:1 (6th ed.). The *Yakoby* plaintiffs did not bring their action under either Rule 23 or any state counterpart and therefore did not bring a class action.

II.    **COUNT II:  THE COMPLAINT ADEQUATELY ALLEGES THAT THE DEPARTMENT VIOLATED THE APA BY NOT PROVIDING NOTICE AND COMMENT WHEN IT ELIMINATED ALL APPEAL RIGHTS IN REGARD TO THE DISMISSAL OF ITS INVESTIGATIONS**

In Count II, Plaintiffs allege that Defendants violated the APA in 2022 by eliminating any right to appeal the Department's termination of an investigation without allowing for notice and comment—a right that had existed in both the 2018 and 2020 versions of the CPM.  Defendants' arguments for dismissal of this claim fail.

A.    **Plaintiffs Have Standing**

Defendants first argue that Plaintiffs lack standing to assert this claim because the 2018 and 2020 CPM did not include a right of appeal for the termination of an investigation on the specific ground Defendants invoked here—that is, on the ground that a private class action with the same allegations has been filed against the same institution and the relief sought is the same as OCR could obtain.  Under Defendants' theory, Plaintiffs did not suffer an injury sufficient to have standing, because the CPM did not provide a right to appeal such a decision even before the elimination of all rights to appeal in 2022.  Mot. 16–17.

Defendants are wrong.  A failure to provide for notice and comment is a "procedural injury."  While a procedural injury does not provide standing on its own, it does provide standing if it is "tethered to some concrete interest adversely affected by the procedural deprivation."  *Ctr. for Biological Diversity* v. *Haaland*, 849 F. App'x 2, at *3 (D.C. Cir. 2021) (internal citation omitted).  "A plaintiff asserting such a violation need not show that but for the procedural violation the agency action would have been different."  *Nat'l Council of Agric. Emps.* v. *U.S. Dep't of Lab.*, No. 22-cv-3569, 2024 WL 324235, at *8 (D.D.C. Jan. 29, 2024) (internal citation and quotation marks omitted).  "Nor is a plaintiff required to establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiff['s] interest."  *Id.*

(internal quotation and citation marks omitted).  Once a plaintiff asserting a procedural injury has "clear[ed] [the] hurdle" of demonstrating a concrete, particularized injury, "the normal standards for immediacy and redressability are relaxed." *Cap. Area Immigrants' Rts. Coal*. v. *Trump*, 471 F. Supp. 3d 25, 38 (D.D.C. 2020) (internal citation and quotation marks omitted).

Here, Plaintiffs have a concrete interest in a right to appeal OCR's premature termination of an investigation, because part of Plaintiffs' core mission is to bring instances of school-sanctioned antisemitism to OCR's attention so that it can conduct an investigation and sanction the school where appropriate.  Even if the right to appeal the specific ground for termination that the Department is now (incorrectly) invoking did not exist under the prior CPM, Plaintiffs could have lobbied for an expansion of the existing appeal rights if the Department had provided for notice and comment when it eliminated other appeal rights in connection with its adoption of the 2022 CPM.  Thus, unlike in *Center for Biological Diversity*, where the plaintiff failed to demonstrate that it had suffered any harm beyond the denial of notice and comment, 849 F. App'x at *3, here the lack of notice and comment eliminated existing appeal rights and precluded Plaintiffs from seeking even broader appeal rights.

Defendants' argument that Plaintiffs lack organizational standing (Mot. 18) also fails. First, Plaintiffs have standing on behalf of their members.  As the complaint alleges, JAFE's membership includes Penn undergraduate, graduate, and law students, as well as Penn faculty, at least two of whom could have sued in their own right.  Compl. ¶¶ 21–25.  Plaintiffs' members also include Jewish students at other universities whose civil rights have been limited by OCR's pattern of wrongfully dismissing campus anti-Semitism complaints.  Compl. ¶ 23.  The interests Plaintiffs seek to protect are also part of the core mission of the organizations, and neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit.  Compl. ¶¶ 18–20, 118; *see Ctr. for Sustainable Econ.* v. *Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015).

Plaintiffs also have standing to sue in their own right.  "To satisfy the injury-in-fact requirement, an organization must allege that it suffered a 'concrete and demonstratable injury to [its] activities—with the consequent drain on [its] resources—[that] constitutes far more than simply a setback to the organization's abstract social interests.'"  *Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 38 (quoting *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 379 (1982)).  In this Circuit, there is a two-prong test to meet this standard.  "First, an organization must show that the challenged conduct perceptibly impair[s] the organization's ability to provide services. . . . Second, an organization must show that it used its resources to counteract [the alleged] harm."  *Id.* (internal citation and quotation marks omitted).

Plaintiffs meet both of those prongs, as the elimination of appeal rights without notice and comment impaired their ability to provide services to their constituents and required Plaintiffs to use their resources to counteract that harm.

*National Federation of the Blind* v. *United States Department of Education,* 407 F. Supp. 3d 524 (D. Md. 2019) is instructive.  The plaintiffs in that case challenged OCR's removal of the right to appeal from its 2015 CPM and made other changes to the manual without notice and comment.  *Id.* at 528–29.  Like here, OCR argued that the plaintiff organizations lacked standing.  *Id.* at 529.  The court found that the plaintiffs had suffered a concrete injury because their "missions include equal access to education, and central to their missions is that each [organization] maintains a regular practice of filing complaints with OCR on behalf of members or others who have been deprived of educational opportunities."  *Id.* at 531.  The plaintiff organizations also "train[ed]" their members on "filing complaints with the DOE OCR" and "educate their members

about laws and regulations relevant to equal educational opportunity." *Id.* at 531–32.  The court found that, "[h]ad Plaintiffs been permitted to participate in a notice-and-comment process, they may have been able to prevent OCR from enacting the challenged provisions of the March 2018 Manual such that they would not have had to engage in such costly and time-consuming efforts." *Id.* at 533.

The same is true here.  Plaintiffs here also maintain a regular practice of filing complaints with OCR.  The Department's suggestions that the Brandeis Center does not have "any other administrative complaints pending with the [Department]" and "that there is [no] substantial risk that they will bring such complaints imminently," Mot. 18, is incorrect.  As the Department is, or should be, well aware, the Brandeis Center has in fact filed numerous administrative complaints similar to its complaint against Penn against other educational institutions, including over a dozen since October 7, 2023.  Indeed, such "legal advocacy to combat anti-Semitism on college and university campuses" is one of the Brandeis Center's main activities.  Compl. ¶ 18.  OCR complaints filed by the Brandeis Center that are listed on the OCR's own website include cases against Pomona College; the University of California Santa Barbara; SUNY New Paltz; Ohio State; the University of Washington; Wellesley College; and the University of Illinois at Chicago.[13]  These cases are currently pending and thus are vulnerable to dismissal under OCR's new procedure.

The Brandeis Center also regularly "empowers students by training them to understand their legal rights and educates administrators and employers on best practices to combat racism and anti-Semitism."  Compl. ¶ 18; *see Nat'l Fed'n of the Blind,* 407 F. Supp. 3d at 532.  And, like the National Federation of the Blind, had the Brandeis Center been permitted to participate in

---

[13]   *See Pending Cases*, *supra* note 8.

notice-and-comment, it too could have avoided the "specific resultant harm" such as "the diversion of resources" it is suffering from now. *See Nat'l Fed'n of the Blind,* 407 F. Supp. 3d at 533.[14] More specifically, the Brandeis Center will either: (i) need to file a greater number of resource-intensive lawsuits in federal courts instead of before OCR because of the risk that its OCR cases will be lost because of OCR's case-dumping, or (ii) waste time and resources developing and filing an OCR complaint, only to have to scramble to seek an alternative remedy in federal court (perhaps after a lapse in time of a year or more) simply because OCR has seized upon a late-filed complaint by an individual to dismiss a pending matter that the Brandeis Center had filed.

### B.    Appellate Rights Are Substantive, Not Procedural

Defendants' argument that Count II fails on the merits (Mot. 20–23) is also incorrect. Contrary to what Defendants argue, the elimination of appeal rights is not merely a "rule of agency organization, procedure, or practice," but rather the elimination of a substantive right.

"In general, the APA requires agencies to publish notice of proposed rules in the Federal Register and to accept and consider comments on them from the public. Those requirements are central to the APA's commitment to public notice and participation." *Am. Fed. of Lab. & Cong. of Indus. Orgs.* v. *NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) ("*AFL-CIO*") (internal quotation marks omitted). The public's participation in the rule-making process "helps to ensure that

---

[14]    Though the court in *National Federation of the Blind* found that the plaintiffs had suffered a concrete injury, it held that the plaintiffs did not have standing because the operative CPM had changed between the time the Plaintiffs had filed their complaint and the time the court issued its opinion. 407 F. Supp. 3d at 535. The court noted that the "Plaintiffs have not alleged in the Amended Complaint any ongoing injury that remains despite the rescission of the March 2018 Manual, or any new injury arising from the November 2018 Manual." *Id.* The Brandeis Center does not suffer from the same set of circumstances. The at-issue manual is still in effect, and without a right to appeal dismissal of a pending investigation, the Brandeis Center will remain at the whims of an agency that appears willing to dismiss legitimate complaints on illegitimate grounds.

regulators are factually well informed and have the benefit of alternative solutions that commenters may suggest." *Id.*

"In keeping with the statutory commitment to public participation in rulemaking, the APA provides only limited exceptions to [its notice and comment] requirements." *Id.* (internal quotation marks omitted).  The exception Defendants rely on—the "procedural exception"—is an exception for "rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).  This "limited carveout is intended for internal house-keeping measures organizing agency activities," and must be "narrowly construed."  *AFL-CIO*, 57 F.4th at 1034–35.

> The critical feature of a rule that satisfies the so-called procedural exception is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.  Where a rule imposes substantive burdens, encodes a substantive value judgment, trenches on substantial private rights or interests, or otherwise alters the rights or interests of parties, it is not procedural for purposes of the section 553 exemption.

*Id.* (cleaned up and internal citations and quotation marks omitted).

The Department's elimination of appeal rights in its 2022 CPM does not fit the narrow "procedural exception."  It was not an "internal house-keeping measure" organizing the Department's activities and did not alter merely "the manner in which parties present themselves or their viewpoints" to the Department.  Rather, it eliminated the right of parties to present their viewpoints to the Department in connection with the termination of an investigation entirely.

Thus, unlike the rules at issue in *AFL-CIO* regarding the timing of voter eligibility, unit scope disputes, and election scheduling that the D.C. Circuit found to be merely procedural rules, *id.* at 1043–47, the Department's elimination of appeal rights is more akin to the delayed certification of union election results that the court in *AFL-CIO* found to be a substantive rule that required notice and comment, because it eliminated employees' right to have their union promptly

engage in collective bargaining on their behalf post-election.  *Id.* at 1039.  Here, similarly, the elimination of appeal rights precludes any participation of adversely affected parties from any right of participation at all.

Defendants' reliance on *Inova Alexandria Hospital* v. *Shalala*, 244 F.3d 342 (4th Cir. 2001), is unavailing.  There, the court held that a rule that required appellants to file a timely position paper was "a procedural rule for handling appeals," rather than a substantive rule.  *Id.* at 350.  The court did not hold that a rule that eliminated appeal rights entirely would be merely a procedural rule; to the contrary, the court stated that "it would be a violation of the Medicare Act if the Board adopted procedures that unduly burdened the right to a hearing."  *Id.* at 349.

*National Security Counselors* v. *C.I.A.*, 931 F. Supp. 2d 77, 105 (D.D.C. 2013) and *Public Citizen* v. *Department of State*, 276 F.3d 634, 637 (D.C. Cir. 2002), which Defendants rely on, are also inapposite.  *National Security Counselors* involved a rule imposing a fee structure in connection with mandatory declassification review, and *Public Citizen* involved a "date-of-request cut-off" policy—both of which were merely procedural rules governing the manner of bringing an appeal, not the entire elimination of appeal rights.

**III.    COUNT III: THE COMPLAINT ADEQUATELY ALLEGES THAT OCR'S TERMINATION OF ITS INVESTIGATION OF PENN WITHOUT ANY OPPORTUNITY FOR THE BRANDEIS CENTER TO BE HEARD WAS A VIOLATION OF DUE PROCESS**

In Count III of the Complaint, Plaintiffs allege that the Department violated their due process rights by failing to provide Plaintiffs with any opportunity to be heard, either before or after the Department's decision to terminate its investigation of Penn in response to the Brandeis Center's complaint.  As alleged in the complaint, Plaintiffs "did not receive any notification when OCR was considering closing or dismissing its complaint on the basis of a parallel judicial

proceeding, and had no opportunity to be heard after OCR effected the dismissal. As a result, [Plaintiffs] lacked any opportunity to contest the closure or dismissal." Compl. ¶ 117.

Defendants argue that: (1) Plaintiffs lack standing to assert this claim; (2) Plaintiffs have no liberty or property interest that is impacted; and (3) the claim does not meet the *Mathews* v. *Eldridge* balancing test.[15] Each of these arguments fails.

With respect to standing, Defendants rely on the arguments they made in regard to Count II, which fail for the reasons discussed above. In addition, whether or not Plaintiffs would have had a right to appeal the termination of the Department's investigation of Penn under its prior CPM is irrelevant to the issue of standing to pursue Count III, which does not turn on the elimination of a prior right to appeal. Rather, Count III concerns the failure to provide any right to participate in the process at all, either before or after the Department's termination of its investigation of Penn.

Plaintiffs' Complaint also adequately alleges the deprivation of a liberty interest. In *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564 (1972), cited by Defendants, the Supreme Court noted the expansiveness of the liberty interests underpinning the due process clause:

> Without doubt, [the liberty interest in the 14th Amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men.

*Id*. at 572–73 (citation omitted). Under this broad standard, Plaintiffs' right to have the Department carry out its statutory duty to investigate their claims regarding Penn's civil rights violations is a

---

[15] Under the balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976), courts weigh three factors to assess the constitutional adequacy of notice: (1) the private interest affected by official action; (2) the risk of error and probable value of additional safeguards; and (3) the government's interest. *See Bello* v. *Gacki*, 94 F.4th 1067, 1075 (D.C. Cir. 2024).

liberty interest that the Department terminated without affording Plaintiffs any due process rights at all. *See Harden* v. *Regional Adm'r*, 977 F.2d 572, at *1 n.* (4th Cir. 1992) (noting that "prison regulations created a liberty interest in the right to appeal prison disciplinary decisions").

Therefore, the cases OCR relies on, which focus on the process used by an agency to investigate a complaint, as opposed to an agency's nonenforcement of discrimination claims, are inapposite. For example, OCR relies heavily on *Women's Equity Action League*, 906 F.2d at 752. That case involved litigation spanning twenty years that had "expanded to colossal proportions," and in which, as the Court noted, "[a]s the litigation swelled in scope, it shifted in focus." *Id.* at 745–46. Originally, the case challenged a deliberate policy of non-enforcement of discrimination claims. But at the end of 1987, the District Court observed that "Plaintiffs no longer claim that defendants have abrogated their statutory responsibilities, but rather that, in carrying them out, they do not always process complaints, conduct investigations, issue letters of findings, or conduct compliance reviews as promptly or expeditiously as plaintiffs would like." *Id.* at 745. For that reason, *Women's Equity* is inapposite. Here, Plaintiffs are challenging OCR's deliberate non-enforcement of Plaintiffs' discrimination claim after initially finding that the claim merited investigation, as opposed to the pace with which OCR is processing complaints.

Defendants' argument that Plaintiffs may simply "vindicate their rights by filing a lawsuit against the university" (Mot. 24) also fails. As discussed above, a private action against a University cannot obtain the same relief as an action brought by the Department.

Finally, Defendants' argument that the claim fails the *Mathews* v. *Eldridge* balancing test is also without merit. Plaintiffs' claim satisfies each of the three prongs. As to whether a private interest is affected, Plaintiffs have described in detail the injuries and harms directed at Plaintiffs through the non-enforcement of federal anti-discrimination laws in this instance. Student

Plaintiffs, for example, will continue to suffer the onslaught of antisemitism and resultant harms, including an inability to access parts of campus and an impairment of their educational opportunities. Compl. ¶¶ 21–24, 70–73. And, as highlighted in Section II.A, the Brandeis Center will be forced to file resource-intensive lawsuits in federal courts or waste resources filing OCR complaints, knowing they might be dismissed on a whim if anyone else files lawsuits lodging similar allegations. As to the risk of error and probable value of additional safeguards, both are high. The Brandeis Center investigated its claims before asserting them and could have provided valuable input as to whether the Department was justified in terminating its investigation based on the filing of the *Yakoby* action. And as to the governmental interest at stake, the Department suggests that the government's only interest is in the amount of time it may take to allow Plaintiffs an opportunity to challenge a decision to terminate an investigation, either before or after the decision is made. Mot. at 25–26. That ignores the government's own interest in seeing that the Department carry out its statutory duties to enforce the nation's civil rights laws.

## CONCLUSION

For the reasons stated above, the Department's Motion to Dismiss should be denied in its entirety. To the extent that the Court grants the motion in whole or in part, Plaintiffs respectfully request leave to replead. Plaintiffs respectfully request an oral hearing on the Department's Motion.

Dated:  December 6, 2024

Respectfully Submitted,

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP

By:  */s/ Mitchell D. Webber*
Mitchell D. Webber (D.C. Bar # 1024005)
Andrew J. Topal (D.C. Bar # 1659154)*
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
mwebber@paulweiss.com
atopal@paulweiss.com

-    and -

Brad S. Karp*
Gregory F. Laufer*
Robert N. Kravitz*
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bkarp@paulweiss.com
glaufer@paulweiss.com
rkravitz@paulweiss.com

* *pro hac vice* application and/or Application for
Admission forthcoming

*Attorneys for Plaintiffs The Louis D. Brandeis
Center, Inc. and Jewish Americans for Fairness in
Education*

**CERTIFICATE OF SERVICE**

I, Mitchell D. Webber, hereby certify that on December 6, 2024, I caused a true and correct copy of the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss, and [Proposed] Order denying Defendants' Motion to Dismiss, to be electronically filed through the Court's ECF filing system, which sent notice to all counsel of record.

Dated: December 6, 2024

/s/ Mitchell D. Webber
Mitchell D. Webber (D.C. Bar # 1024005)